131 N.J. Super. 182 (1974)
329 A.2d 82
MARGARET I. BRANDT, GENERAL ADMINISTRATRIX, ETC., ET AL., PLAINTIFF,
v.
CHARLES J. GRUBIN, M.D., ET ALS., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided November 15, 1974.
*184 Mr. William O. Barnes, Jr. argued the motion for plaintiff.
Mr. George F. Murphy, Jr. argued the motion for defendant (Messrs. McDonough, Murray & Korn, attorneys).
DREIER, J.D.C., Temporarily Assigned.
In this medical malpractice action defendant Dr. Charles J. Grubin has moved for summary judgment. This case raises an issue of first impression in New Jersey concerning the alleged abandonment by a physician who had referred a patient for specialized services.
Both R. 4:46-2 and the cases interpreting this rule and its predecessor R. 4:58-3 dictate that this court must find that there is an absence of dispute as to material facts, and must give to plaintiff all favorable inferences reasonably to be drawn from the expert's report, depositions and interrogatories. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74-76 (1954). This court, therefore, has searched the depositions and other documents supporting plaintiff's position to see if there is a palpably genuine issue as to any material fact. From that point of departure, the following facts appear.
Defendant Dr. Grubin is a licensed and practicing physician of the State of New Jersey engaged in the general practice of medicine. He is alleged to have been the physician of plaintiff, the decedent's mother, but her depositions show his earlier services had been limited to signing one or two death certificates for the family. On October 25, 1971, and for some time prior thereto, decedent, George F. Brandt, *185 Jr., then 21 years of age, was alleged to have experienced periods of anxiety, loneliness and insomnia, as described by Dr. Grubin. On this date (and perhaps one other occasion) decedent consulted Dr. Grubin for examination, care and treatment of these conditions.
In answers to interrogatories Dr. Grubin stated:
The patient was seen on 10/25/71. He came to defendant's office at 123 Hillside Avenue, Hillside, New Jersey. He showed symptoms of anxiety, loneliness and insomnia. He presented a history of having LSK [sic] but no other drugs. He gave an impression of schizophrenia and was referred to Elizabeth Mental Hygiene Clinic or the Mount Carmel Guild Mental Hygiene Clinic in Cranford. He was given a prescription of thorazine 10 mmgs. #15 one or two three times daily no refills. * * *
At his deposition Dr. Grubin characterized the decedent's mental condition on October 25, 1971 as "an anxiety syndrome." He admitted that he was not a psychiatrist, but nevertheless prescribed thorazine to be taken by decedent "to take the edge off his anxiety." He admitted that the principal contraindication for the use or prescription of thorazine is depression, and the second most important contraindication is liver disease. With respect to depression as a contraindication, he noted that "the literature says in the presence of depression thorazine should be used very cautiously and that's all I have to see and I don't touch it.
After this one visit, and perhaps an additional contact a few days later (see Mrs. Freda's deposition quoted infra), decedent did not return to Dr. Grubin. A month later, on November 21, 1971, decedent was treated at the Elizabeth General Hospital Emergency Room and was again advised to go to the Union County Psychiatric Clinic for further treatment. Two days later (on November 23, 1971) he was again admitted into the hospital's medical ward, and then placed in the psychiatric ward just prior to his suicide on November 26, 1971.
On the subject of Dr. Grubin's later alleged unavailability, decedent's sister, Mrs. Frances Freda, stated in her depositions *186 that the family attempted repeatedly to contact Dr. Grubin the week prior to decedent's confinement at Elizabeth General Hospital on November 23, 1971. She testified that "for the whole weekend we tried to reach Dr. Grubin and we just got a series of runarounds," and further:
My mother's neighbor was there also. She even attempted to get in touch with Dr. Grubin. We called the priest to come. He said he needs a doctor. There was nothing he could do. I mean, it just seemed that Dr. Grubin was evasive.
At one point my mother called him and spoke with the nurse again. We explained to him all these times it was an emergency, that we had to speak to him immediately. We told him who we were, who we were calling for, and this last time when my mother called she asked him has Dr. Grubin returned yet and the nurse said, "Returned? He's always been here. He hasn't gone anyplace." It was as if, you know, we are lying, that we are calling him and we never really talked to any of the answering services. We waited and Dr. Grubin wasn't there from what we gathered from the answering service, that's as far as I can remember.
Plaintiff has submitted an expert report from Dr. Lewis J. Vorhaus II, of New York City. This report is over seven single-spaced typewritten pages in length, less than a page of which concerns the actions of Dr. Grubin. Although the basis for Dr. Grubin's alleged liability is set forth in one paragraph, in reality three separate claims are made. Set apart, these are:
With respect to Dr. Grubin I think that he was also guilty of departing from accepted standards of practice in not adequately assessing the seriousness of the situation when he saw the patient in his office. It was not enough that he merely suggest to the patient that he get psychiatric help. He obviously was not competent to make judgments for himself or to follow directions given by a physician. Responsibility for this should have been placed in the hands of the family and they should have been notified about the seriousness of his problem.
The treatment that was given was totally inadequate. If there was any question in Dr. Grubin's mind about the severity of the psychiatric problem he should have seen to it that the patient got psychiatric consultation and evaluation before making any recommendations whatsoever. Simply to give the patient a small dose of thorazine and tell the patient to get psychiatric help was clearly inadequate for the needs of the situation.
*187 With respect to his further conduct there apparently is a difference of opinion between the mother of the decedent and the doctor. She claims she tried to reach him and he did not respond to her calls. He claims he got no calls. This would be a matter obviously for the jury to decide. I can only say that if it can be demonstrated that he did not respond to calls for help from the patient's mother and failed to call her back when she sought his help subsequent to his first examination of the boy then this too would be a departure from accepted standards of practice in that he failed to meet his obligations toward the patient or failed to be adequately responsive to the needs in this case.
In short, the three claims of malpractice are Dr. Grubin's (1) inadequate assessment of the "seriousness of the situation," (2) "inadequate" treatment and (3) abandonment of the patient. The adverse physiological consequences of the dose of thorazine and its causal connection with the suicide are nowhere substantiated by competent medical proof, and thus will not be considered with respect to this motion, since the same would be excluded at the trial (unless the expert's report had been supplemented). After the first argument of this motion counsel were given an opportunity to supply the court with an expert's report prior to the reargument on November 1, 1974, and the above-quoted extracts from plaintiff's expert were the only references to the actions of Dr. Grubin. No affidavits were submitted by either party.
With respect to plaintiff's claim that Dr. Grubin did not adequately assess the situation and should have informed the family of the need for additional treatment and the seriousness of the problem, the deposition of Mrs. Freda is revealing. Where Dr. Grubin has alleged in his interrogatories that he referred the decedent to a competent mental hygiene clinic, it appears that the reference was by means of a written direction which decedent was instructed to bring home to his family, and which they in fact received. The deposition states:
Q. You mentioned earlier when you were trying to convince your brother to seek psychiatric help that you did this on Dr. Grubin's advice.
*188 A. Yes. That was only from the form that he sent to my brother. He wrote on it that my brother needed psychiatric help. He wrote exactly what was wrong, that he was religious orientation and schizophrenia, something about schizophrenia, and something on the bottom he wrote, "needs psychiatric treatment." This is when Dr. Grubin had given this to my brother several days after he saw him. He told him that he would examine, you know, the case to find out just what should be done, and he told my brother to come back and my brother did go back and brought this form home for us.
Q. Do you still have that form?
A. No. That was to be brought to the Mt. Carmel Guild, which my brother did.
The mother, however, gave a different account. She stated:
"[Dr. Grubin] just told me what my boy needed and told him to go to Mount Carmel Guild."
Q. In other words, your son had some writing on a slip of paper, is that correct?
A. Yes, written down.
Q. Do you know what George did with the piece of paper?
A. He went to Mt. Carmel Guild with it.
Later she also stated with respect to the Mt. Carmel Guild treatment: "He did went there a few times." [sic]
Thus we see that over a month before decedent's suicide Dr. Grubin had recommended psychiatric care not only directly to decedent, but in the note brought home to decedent's family; also, decedent entered into the recommended relationship with the mental health clinic. It was not until a month later that decedent went to the emergency room at Elizabeth General Hospital for treatment, and was advised to go to the Union County Psychiatric Clinic for further treatment. Two days after that decedent was admitted to the hospital, placed in a medical ward initially, and then in the psychiatric ward just prior to his death. At these latter dates there was no contact with Dr. Grubin. The treatment by the doctor had terminated with respect to this illness when Dr. Grubin informed the patient and family that the decedent needed psychiatric help and referred decedent to a psychiatric clinic. There is no legal authority to support Dr. Vorhaus' opinion that there is a duty (especially in *189 light of the confidential physician-patient relationship) of a physician to contact an adult patient's family with respect to treatment. But here responsibility was in effect placed in the hands of decedent and his family, who were specifically notified of the seriousness of the problem by the note on which was written (according to decedent's sister) "exactly what was wrong," and when the mother was told (according to her) "what my boy needed."
In Parker v. Goldstein, 78 N.J. Super. 472, 479 (App. Div. 1963), certif. den. 40 N.J. 225 (1963), the court stated:
In an action for negligence or malpractice against a physician, the plaintiff ordinarily is required to establish that defendant's treatment or care fell below the standard established and recognized by the medical profession for the indicated condition of the patient, and the standard must be proven by expert medical testimony. [citation omitted] * * *.
There, a hypothetical question posed to an expert postulated an incorrect delivery date of the pregnant decedent. The court commented (at 480): "As will shortly appear, this misleading assumption directly led to the opinion of Dr. Graubard that the defendant deviated from the standard pertaining to [the] claim * * *." The court therefore did not consider the expert's report as providing a basis for withstanding the argument that plaintiff's claims were unsupported. The seriousness of the situation had been assessed by Dr. Grubin, and procedure similar to that suggested by Dr. Vorhaus was actually followed.
With respect to the treatment that was given, the inadequacy noted in Dr. Vorhaus' report was that Dr. Grubin should have seen that the patient obtained a psychiatric consultation and evaluation before making recommendations and administering the small dose of thorazine. But, applying the principles described above in Parker, the facts in our case show that the patient was sent for the very help noted by Dr. Vorhaus  a psychiatric consultation. To require *190 a physician to obtain a consultation from the same source to which he is about to refer his patient would be meaningless. A general practitioner, when faced with a specialized problem, should not be faulted because he referred his patient to a specialist, or in this case a clinic of specialists, in a situation where the patient presumably could not afford private psychiatric help. The duty of the initial doctor ends upon the patient's undergoing the subsequent treatment. (See the following discussion concerning the abandonment issue.)
As noted earlier, no causal connection has been supported by an expert's opinion with respect to the administration of thorazine. Even if Dr. Grubin had been negligent in failing to diagnose depression, and therefore should not have administered or prescribed thorazine, there is no showing that this drug was a factor substantially contributing to the suicide. When this motion was initially argued this court was concerned with whether there could be a causal connection between the administration of thorazine and decedent's death. Consequently, plaintiff's counsel was then given the opportunity to supplement his proof by submitting an expert's report. He was specifically directed to the problem of connecting the thorazine to the death. Since no such connection was supplied by Dr. Vorhaus' report, this court cannot supply this missing medical link in plaintiff's chain of proof. Parker v. Goldstein, supra, 78 N.J. Super. at 480.
It is the third allegation that presents the greatest problem in assessing this case on a motion for summary judgment. The first two points had involved factual references by the expert which were not borne out by the statements of plaintiff's own witnesses in depositions and interrogatories. This third basis, however, involves a sharp conflict as to the facts and an application of legal principles. Of course, this court will accept plaintiff's version of the facts in deciding this motion and assume that Dr. Grubin was repeatedly called for assistance during the days immediately preceding decedent's hospitalization.
*191 The question of proximate cause, given the alleged subsequent negligence of the hospital and supervising doctors, should not be passed upon on this motion for summary judgment. This ought to wait a jury's determination, but only if there were a legal duty of the doctor to give advice to the family and perhaps see that decedent was hospitalized sooner.
The question of abandonment of a patient was considered in detail in Clark v. Wichman, 72 N.J. Super., 486, 491-492 (App. Div. 1962). In that case plaintiff had been injured in an automobile accident and had been taken to a hospital for treatment of a fractured femur. She developed a traumatic psychosis and was committed by court order to a state mental hospital for approximately 2 1/2 weeks, during which period she was not under the care of her orthopedic surgeon. She argued that the surgeon abandoned her when she was committed to the mental hospital, but the court held that this argument was without merit, particularly when the transfer had been pursuant to an order of the court.
* * * This is not a case of unwarranted forsaking of a patient without notice or without providing a competent substitute physician [citing authorities]. Where a physician under appropriate circumstances ceases to attend a patient, his responsibility ordinarily ceases without any formality [citing cases]. An abandonment consists of "a failure by the physician to continue to provide service to the patient when it is still needed in a case for which the physician has assumed responsibility and from which he has not been properly relieved." [citing authorities]. [at 491-492; emphasis in original]
The cases bearing on this point are collected in an Annotation, "Liability of Physician Who Abandons Case," 57 A.L.R.2d 432, 439-443. The general statement of the rule concerning a physician's withdrawal from the case is expressed as follows:
It is the settled rule that one who engages a physician to treat his case impliedly engages him to attend throughout that illness, or until his services are dispensed with. In other words, the relation of physician and patient, once initiated, continues until it is ended by the consent of the parties or revoked by the dismissal of the physician, *192 or until the latter's services are no longer needed. However, the relationship of physician and patient may also be terminated by the physician's withdrawal from the case. It is well recognized that the physician has a right to withdraw from the case, but only after giving the patient reasonable notice so as to enable him to secure other medical attendance, and such a withdrawal does not constitute abandonment. [at 439, emphasis supplied]
See also, Ricks v. Budge, 91 Utah 307, 64 P.2d 208 (Sup. Ct. 1937); Mucci v. Houghton, 89 Iowa 608, 57 N.W. 305 (Sup. Ct. 1894); Gray v. Davidson, 15 Wash.2d 257, 130 P.2d 341, 136 P.2d 187 (Sup. Ct. 1942), Noren v. American School of Osteopathy, 223 Mo. App. 278, 2 S.W.2d 215 (App. Ct. 1928), cert. quashed 322 Mo. 991, 18 S.W.2d 487 (Sup. Ct. 1929); Lawson v. Conaway, 37 W. Va. 159, 16 S.E. 564 (Sup. Ct. 1892); Lathrope v. Flood, 6 Cal. Unrep. 637, 63 P. 1007 (Sup. Ct. 1901) rev'd on other grounds 135 Cal. 458, 67 P. 683 (Sup. Ct. 1902). Cf. Sibert v. Boger, 260 S.W.2d 569, 571-572 (Mo. Sup. Ct. 1953). In Sibert negligence and abandonment of plaintiff were alleged where a doctor had been unable successfully to treat plaintiff and had told her "he could do nothing further for her and suggested that she go to someone else." The Supreme Court of Missouri found that the physician had withdrawn after reasonable notice. The court stated:
It is true respondent told appellant on February 16, 1944, to go to another physician, but the evidence shows that she was already consulting another physician in the same town during the time she was under the care of respondent. She, therefore, was not abandoned without medical care. Moreover, in a city as large as Sedalia, medical service could have been obtained any day. At least, there is no evidence to the contrary. [at 572]
The editors of the Annotation note further:
It is a corollary to the physician's right to withdraw from a case upon giving proper notice that he is under a duty to continue his attendance upon the patient until all the conditions for his rightful withdrawal are complied with, and that a breach of this duty may render him liable.
*193 Thus it may be stated as a general rule that a physician who is engaged to attend a patient is liable for any damages caused by his abandoning the patient without due notice to his patient, and without affording the latter an opportunity to procure the attendance of another doctor. Expressed differently, abandonment of a case by a physician without sufficient notice or adequate excuse is a dereliction of duty, and if injury results therefrom, the physician may be held liable in damages. * * * [57 A.L.R.2d at 440]
This principle is merely an expansion of the brief statement quoted earlier in Clark v. Wichman (72 N.J. Super. at 492), and is supported in the Annotation and Supplements by cases too numerous to cite.
The foregoing statements of the rule pertain to a physician who has undertaken the general treatment of a patient without an agreement limiting his services. A modified rule pertains, however, to a physician who has been employed only for a specific occasion or service, and such physician "is under no duty to continue his visits or treatment thereafter, and is consequently not liable for abandonment if he ceases treatment of his patient after performance of the specific service." 57 A.L.R.2d at 460. The Annotation cites two cases where a physician's services were limited to one call only. "Under such an agreement the physician is not liable for abandonment if he fails or refuses to treat the patient any further." See Miller v. Blackburn, 170 Ky. 263, 185 S.W. 864 (Ct. App. 1916); Brown v. Dark, 196 Ark. 724, 119 S.W.2d 529 (Sup. Ct. 1938). A similar rule applies if a physician is called for consultation or assistance only. Shannon v. Ramsey, 288 Mass. 543, 193 N.E. 235 (Sup. Jud. Ct. 1934); Tomer v. Aiken, 126 Iowa 114, 101 N.W. 769 (Sup. Ct. 1904), and Nelson v. Farrish, 143 Minn. 368, 173 N.W. 715 (Sup. Ct. 1919).
This court is of the opinion that the same rule must apply if a patient is examined by a physician who by reason of his general practice determines that he is unable to provide needed specialized treatment and that the patient must therefore be referred to a specialist. In this case the reference was made to specific clinics where specialized help would be *194 available, and the patient actually underwent care at one of these clinics. The fact that the decedent's mother had briefly utilized defendant's services on an earlier occasion did not render him decedent's physician under any general contract to provide care. The only proofs before the court by way of expert reports, depositions and interrogatory answers show that decedent visited Dr. Grubin for a specific purpose, and after this one visit Dr. Grubin found that he was incapable of providing the requested services. This was explained to decedent, and the subsequent events cannot be legally ascribed to any abandonment by Dr. Grubin. Whatever efforts were made by decedent's family to contact Dr. Grubin are of no legal import since no duty then flowed from Dr. Grubin to decedent.
To summarize, the record has been closely reviewed to determine whether there is a factual and legal basis for plaintiff's claims against Dr. Grubin. In malpractice actions, unlike most other negligence cases, the trial itself may have an adverse effect upon defendant's professional life. Courts should be aware that even allegations of malpractice against physicians and other professionals may have such effect. As noted in this opinion, the application of the principles of negligence law to the facts alleged by plaintiff should not render the defendant liable, and therefore the matter should be terminated at this stage insofar as Dr. Grubin is concerned. A physician who upon an initial examination determines that he is incapable of helping his patient, and who refers the patient to a source of competent medical assistance, should be held liable neither for the actions of subsequent treating professionals nor for his refusal to become further involved with the case.
Defendant Grubin's motion for summary judgment is therefore granted.