A02A2187. GRANT et al. v. DOUGLAS WOMEN'S CLINIC, P.C. et al.
(580 SE2d 532)

RUFFIN, Presiding Judge.

Mayme and Carlton Grant sued Dr. Phillip Potter, M.D., FACOG, P.C.[1] ("Potter"), and Douglas Women's Clinic, P.C., alleging that the defendants' negligence caused the death of their newborn

---

[1] This defendant is Dr. Potter's corporate identity.

child. Potter moved for summary judgment, asserting that he was not liable because there was no physician/patient relationship. The trial court granted Potter's motion, and the Grants appeal.

To prevail on a motion for summary judgment, "[t]he moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law."[2]

Viewed in this light, the evidence shows that Mrs. Grant had several difficult pregnancies. Out of five pregnancies, she had given birth to only one child who survived. In January 1996, Mrs. Grant suspected she was pregnant again and, on January 16, 1996, was seen by Dr. Lisa Ortenzi, an obstetrician at the Douglas Women's Clinic. Dr. Ortenzi, who had treated Mrs. Grant during previous pregnancies, confirmed that she was pregnant.

Initially, Mrs. Grant's pregnancy progressed normally, but during a May 6, 1996 examination, Dr. Ortenzi diagnosed Mrs. Grant with an incompetent cervix. Dr. Ortenzi immediately admitted Mrs. Grant to the hospital for a procedure to strengthen her cervix and discharged her the following day. On May 8, however, Mrs. Grant was readmitted into the hospital.

Because Mrs. Grant was a high risk patient, Dr. Ortenzi asked Dr. Potter, whose group specializes in high risk pregnancies, if it would consult on Grant's treatment. Dr. Potter agreed, and it is undisputed that, from May 8 through June 10, Dr. Potter and Dr. Page, another physician in Potter's group, treated Mrs. Grant while she was in the hospital. On June 10, the last time Dr. Potter examined Mrs. Grant, he wrote on the chart: "Nothing to add — Looks good [signed] Potter."

Dr. Potter had no further contact with Mrs. Grant, who remained hospitalized. On July 19, 1996, Dr. Ortenzi called Dr. Potter to discuss discharging Mrs. Grant from the hospital. According to Dr. Ortenzi, she gave "Dr. Potter . . . all the information on which [she] based [her] decision to discharge Mrs. Grant." Based upon their conversation and Dr. Potter's medical opinion, Dr. Ortenzi discharged Mrs. Grant from the hospital. Mrs. Grant, however, was unaware that Dr. Ortenzi had spoken with Dr. Potter regarding the discharge.

Almost a week after being discharged from the hospital, Mrs. Grant went into premature labor, and she returned to the hospital where an emergency C-section was performed. That same day, the Grants' newborn child died from a suspected infection.

The Grants sued Dr. Potter, alleging, among other things, that his negligence in discharging Mrs. Grant from the hospital when she

---

[2] *Anderson v. Houser*, 240 Ga. App. 613 (523 SE2d 342) (1999).

and her child were at risk of infection fell below the acceptable standard of care. Dr. Potter moved for summary judgment, arguing that no physician/patient relationship existed when Mrs. Grant was discharged, precluding any claim against the group. Specifically, Dr. Potter maintains that the notation he made in Mrs. Grant's chart on June 10, 1996, demonstrated that he was withdrawing from her care. According to Dr. Potter, his discussion with Dr. Ortenzi on July 19, 1996, was merely a " 'curb-side consult' " with another physician, which did not serve to renew the physician/patient relationship with his former patient.

In order to sustain a claim against Dr. Potter, the Grants must demonstrate that a physician/patient relationship existed as

> it is this relation which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct. The relationship is considered consensual where the patient knowingly seeks the assistance of the physician and the physician knowingly accepts [her] as a patient.[3]

It is undisputed that Dr. Potter and Mrs. Grant had a physician/patient relationship from May 8 through June 10, 1996. Thus, the issue is whether that relationship continued beyond that date. Dr. Potter suggests that he withdrew from treating Mrs. Grant. However, before a doctor may unilaterally withdraw from treating a patient, he must provide reasonable notice of his withdrawal to enable the patient to obtain substitute care if she desires.[4] Here, we must consider, therefore, whether Dr. Potter's chart notation in Mrs. Grant's chart that he had "[n]othing to add" constitutes reasonable notice as a matter of law, warranting summary judgment in his favor.[5] It does not.

Initially, we note that Dr. Potter's entry did not clearly state that he was withdrawing from treatment. Given the vague language employed, we cannot say, as a matter of law, that the chart constituted reasonable notice of the doctor's intent to withdraw. Moreover, no evidence is cited that Mrs. Grant read or had any reason to review her chart to discover that Dr. Potter was withdrawing. Thus, even if the entry is interpreted as a notice of the physician's withdrawal, it is unclear how such notice was communicated to the patient. Arguably,

---

[3] (Citation omitted.) Id. at 615 (1).

[4] See *Allison v. Patel*, 211 Ga. App. 376, 385 (3) (438 SE2d 920) (1993).

[5] In support of their argument that the physician/patient relationship continued, the Grants cite to the affidavit of their expert, who concluded that Dr. Potter's pithy chart entry did not serve to terminate the relationship. We note, however, that an expert's opinion is inadmissible regarding the existence of a physician/patient relationship. See *Minster v. Pohl*, 206 Ga. App. 617, 619 (1) (426 SE2d 204) (1992).

the fact that neither Dr. Potter nor Dr. Page examined Mrs. Grant during the final weeks of her hospitalization communicated that Dr. Potter had, in fact, withdrawn from treatment. However, in her affidavit, Mrs. Grant averred that she "continued to have a physician patient relationship with Dr. Potter during the entire hospitalization, through the date of discharge." Accordingly, a jury issue remains as to whether Dr. Potter provided reasonable notice of his intent to withdraw from Mrs. Grant's treatment.

In addition to withdrawing from treatment, there are other methods by which a physician/patient relationship may end. Although we are aware of no Georgia case on this issue, other jurisdictions have recognized that such relationship also can end by: (1) mutual consent; (2) the patient's dismissal of the physician; or (3) the cessation of the need for the relationship.[6] In this case, there is no evidence that Mrs. Grant dismissed Dr. Potter. The fact that Dr. Potter did not examine Mrs. Grant during the final weeks of her hospital stay and that Mrs. Grant made no effort to contact him during this time could be construed as demonstrating the parties' mutual consent to the end of the physician/patient relationship. In addition, Dr. Potter's chart entry that he had "[n]othing to add" could be construed as a finding that the need for his services had ended, which could also serve as a possible basis for termination of the physician/patient relationship.

Nevertheless, the fact that the evidence might be construed in this manner does not mean that it should be so construed as a matter of law. Given that Dr. Potter treated Mrs. Grant during her hospitalization, never expressly communicated his withdrawal, and rendered a medical opinion regarding her possible discharge, the evidence could support a finding that the physician/patient relationship continued through the date of Mrs. Grant's discharge from the hospital. Under these circumstances, a jury issue remains as to whether a physician/patient relationship existed, and the trial court erred in granting summary judgment on this basis.

*Judgment reversed. Barnes and Adams, JJ., concur.*

---

[6] See *Church v. Perales*, 39 SW3d 149, 164 (Tenn. App. 2000); *Weiss v. Rojanasathit*, 975 SW2d 113, 119-120 (Mo. 1998); *Brandt v. Grubin*, 131 N.J. Super. 182, 190-193 (329 A2d 82) (1974); *McManus v. Donlin*, 23 Wis.2d 289, 300-302 (127 NW2d 22) (1964). We note that the parties have not cited any American Medical Association standards governing termination of the physician/patient relationship.

DECIDED JANUARY 10, 2003 —
RECONSIDERATION DENIED MARCH 31, 2003.

*King & Hobbs, Joseph H. King, Jr., Adrienne P. Hobbs*, for appellants.

*Allen & Weathington, Paul E. Weathington, Ramon D. Sammons, Jr., Gary R. McCain, Robert T. Strang III, Hall, Booth, Smith & Slover, John E. Hall, Jr.*, for appellees.