STEPHEN GARDINE POTTER A/K/A STEVEN POTTER A/K/A STEVEN GARDINE A/K/A STEPHEN GARDINE, AN INFANT BY HIS GUARDIAN *AD LITEM*, VALDERINE OLIVIA POTTER AND VALDERINE OLIVIA POTTER, INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. CHARLES V. FINCH & SONS, A CORPORATION OF NEW JERSEY, CLARENCE FINCH, SR. AND CLARENCE FINCH, JR., INDIVIDUALLY AND TRADING AS CLARENCE V. FINCH & SONS AND/OR CHARLES V. FINCH & SONS, MONGIELLO BROS. FUEL OIL & COAL, INC., 100 GARFIELD CORP., DEFENDANTS, AND RICHARD HEGIE, ROBERT CHAPTON, JOE GUGLIUCCI, J. CARROLL AND T. D. TIMPANY, TRUSTEE IN BANKRUPTCY OF CENTRAL RAILROAD OF NEW JERSEY, JOINTLY, SEVERALLY OR IN THE ALTERNATIVE, DEFENDANTS-RESPONDENTS.

Argued January 23, 1978—Decided June 7, 1978.

*Mr. Nathan Beck* argued the cause for appellants (*Messrs. Davis, Roth & Beck,* attorneys).

*Mr. Prospero Da Bona* argued the cause for respondents (*Messrs. De Bona & Johnson,* attorneys; *Mr. Joseph J. Ryglicki* on the brief).

PER CURIAM. This case involves the issue of the liability of defendant-railroad and the members of one of its train crews for an accident to an eleven year-old boy. On December 5, 1972, the boy, while walking on defendant's railroad tracks, was struck by a train and severely injured. Suit was filed by the boy's mother individually and as guardian *ad litem* for the boy, against the railroad and the members of the crew of the train which struck him.[1]

---

[1]The suit also joined as defendants certain property owners and businesses adjacent to the scene of the accident. These defendants,

Motions for summary judgment were filed on behalf of the railroad and its employees, relying on *N. J. S. A.* 48:12–152 which, *inter alia,* provides that any person injured by an engine or car while walking, standing or playing on a railroad shall be deemed to have contributed to the injury sustained and shall not recover therefor any damages from the company owning or operating the railroad.

The trial court found the statute controlling and granted summary judgment in favor of the railroad. However, it also ruled that the statutory bar against recovery of damages did not extend to suits against employees of a railroad. Accordingly, it denied their motion for summary judgment.

Counsel for the employees moved for a rehearing of their motion and submitted to the court an unreported opinion of the Appellate Division which had held that the statute controlled with regard to suits against railroad employees as well as the railroad. Based on the foregoing, the trial court then ruled that the suit against the members of the train crew was also barred by *N. J. S. A.* 48:12–152 and entered summary judgment in their favor. Plaintiffs appealed, challenging the aforesaid rulings. The Appellate Division in an unreported opinion affirmed. This Court granted certification. 75 *N. J.* 18 (1977). We reverse in part.

The statute in question, *N. J. S. A.* 48:12–152, provides as follows:

It shall not be lawful for any person other than those connected with or employed upon the railroad to walk along the tracks of any railroad except when the same shall be laid upon a public highway.

Any person injured by an engine or car while walking, standing or playing on a railroad or by jumping on or off a car while in motion shall be deemed to have contributed to the injury sustained and shall not recover therefor any damages from the company owning or operating the railroad. This section shall not apply to the

on motions, were granted summary judgments in their favor and plaintiffs have not challenged these rulings on appeal.

crossing of a railroad by a person at any lawful public or private crossing.

It has uniformly been held that the statute operates as an absolute bar to recovery of damages for injuries unless willful or wanton conduct is shown.[2] *Erie R. Co. v. Duplak,* 286 *U. S.* 440, 52 *S. Ct.* 610, 76 *L. Ed.* 1214 (1932) ; *Erie R. Co. v. Hilt,* 247 *U. S.* 97, 38 *S. Ct.* 435, 62 *L. Ed.* 1003 (1918) ; *Egan v. Erie R. Co.,* 29 *N. J.* 243 (1952) ; *Hess v. Atlantic City Railroad Co.,* 95 *N. J. L.* 494 (E. & A. 1921). The statutory bar extends to infant trespassers as well as to adults. *Egan, supra,* 29 *N. J.* at 248–250.

When the statute was enacted, the policy of the common law of New Jersey was that a landowner owed no duty of care to a trespasser other than to refrain from causing injury to such person by wilful and wanton conduct. The statute adopted this policy in an unqualified form in relation to railroads. *Egan, supra,* 29 *N. J.* at 250–251.

██ However, immunity from tort liability is not favored in the law since it bars the injured person from the recovery of compensatory damages against the party who is otherwise responsible for the injury. *Immer v. Risko,* 56 *N. J.* 482, 495 (1970) ; *Willis, et al. v. Dept. of Cons. & Ec. Dev.,* 55 *N. J.* 534, 537–539 (1970) ; *Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29, 47–48 (1958). For that reason, statutes such as *N. J. S. A.* 48:12–152 must be strictly construed and not extended beyond their plain meaning.

The bar against recovery contained in *N. J. S. A.* 48:12–152 by its terms extends to "the company owning or operating the railroad." The Legislature did not expressly include employees of the railroad and we do not find in the statute an indication that this was intended.

---

[2]There are a few other exceptions which are not here pertinent. See *e. g., Kovacs v. Pennsylvania R. R. Co.,* 76 *N. J. Super.* 451, 458 (App. Div. 1962).

It is one thing to relieve a railroad from liability to trespassers because of its vital function as an instrument of transportation and commerce, the enormous territory it necessarily encompasses and the practical impossibility of guarding against trespassing. *Egan, supra,* 29 *N. J.* at 253. However, this rationale does not extend to relieving a railroad employee from responsibility for the consequences of his own negligent conduct.

■ Accordingly, we conclude that the provisions of *N. J. S. A.* 48:12-152 apply only to the railroad and not to railroad employees. The grant of summary judgment, therefore, in favor of defendant-employees must be reversed and the matter remanded for trial.

As to the railroad, plaintiffs ask that we reconsider our holding in *Egan, supra,* and declare *N. J. S. A.* 48:12-152 unconstitutional and in violation of the equal protection provisions of our State and Federal Constitutions. Plaintiffs also submit that the statute unconstitutionally grants immunity to a special class, contrary to the provisions of the New Jersey Constitution, Art. IV, § VII, pars. 7, 8 and 9 (8).

■ We find no constitutional infirmity. The statute was first enacted in 1869, *L.* 1869, c. 285. Its validity has not been questioned in the many cases which have applied its provisions. *Erie R. Co. v. Duplak, supra; Erie R. Co. v. Hilt, supra; Hess v. Atlantic City Railroad Co., supra; Barcolini v. Atlantic City & S. R. Co.,* 82 *N. J. L.* 107 (Sup. Ct. 1911); *Mack v. Lehigh Val. R. Co.,* 283 *F.* 2d 405 (3 Cir. 1960), *cert.* den. 365 *U. S.* 818, 81 *S. Ct.* 700, 5 *L. Ed.* 2d 696 (1961). In *Egan, supra,* 29 *N. J.* at 252-254, a direct attack on the statute on equal protection grounds was rejected by this Court. In so doing we found that the legislative classification made in the statute had a reasonable basis because of the subject matter involved. We have been shown no reason to question now the *Egan* holding, the rationale of which extends to plaintiff's additional argument that the statute unconstitutionally grants immunity to a special class.

We recognize that the statutory provision might well merit legislative attention. As noted, it is bottomed on the old common law doctrine of New Jersey that an owner of land owed no duty of care to a trespasser except to refrain from causing injury to such person by willful or wanton conduct. That doctrine has now been modified in this State so as to put the interest of the parties in better balance. *Simmel v. New Jersey Coop. Co.*, 28 *N. J.* 1 (1958); *Imre v. Riegel Paper Corp.*, 24 *N. J.* 438, 444–445 (1957); also, see generally, Annotation, "Duty to take affirmative action to avoid injury to trespasser in position of peril through no fault of landowner," 70 *A. L. R.* 3d 1125 (1976). Also, in 1973 the Legislature enacted the Comparative Negligence Act, *N. J. S. A.* 2A:15–5.1 *et seq.* which has substantially changed the common law rule that contributory negligence was a bar to tort recovery.[3]

In short, we conclude as we did in *Egan* that *N. J. S. A.* 48:12–152 is a constitutionally permissible expression of legislative intent. We also conclude that the statutory bar against recovery from the railroad extends to any claimed vicarious liability of the railroad for the acts or omissions of its employees.

The judgment in favor of defendant-railroad is affirmed without costs. The judgment in favor of defendant-employees is reversed and the matter remanded for trial.

PASHMAN, J., dissenting. The Court, with obvious reluctance, has chosen to uphold *N. J. S. A.* 48:12–152 by reaffirming the validity of *Egan v. Erie R. Co.*, 29 *N. J.* 243 (1959), a decision as wrong today as it was on the day it was handed down. The *Egan* court used strained logic to jus-

---

[3]The 1973 Comparative Negligence Act, by its terms, applies only to causes of action arising after its effective date. Plaintiff's accident happened on December 5, 1972. Even if we were to find in the enactment of the Comparative Negligence Act a legislative intent to modify *N. J. S. A.* 48:12–152 so as to eliminate the absolute bar to recovery, it would not benefit plaintiffs.

tify the privileged status of railroads *vis-a-vis* other common carriers, and the reason seized upon was no more than a featherweight justification for this statutory anomaly. The statute so dutifully deferred to had its origin in 1869, was slightly changed to its present form in 1903 and was re-enacted in the general revision of the New Jersey statutes in 1937. While some things improve with age, this statute, originally passed to encourage expansion of a revolutionary new mode of transportation, is an undeserving candidate for constitutional enshrinement a century later.

Our Constitutions, federal and state, are documents designed to have some permanency. This is most notably so with the former, which has been amended only 26 times in nearly 200 years. However, the value of these societal blue-prints is in their adaptability. The democratic experiment which is this country could hardly have survived, let alone prospered, if the early constitutional pronouncements of our Supreme Court were deemed immutable. Our constitutional charters are vital, dynamic documents whose interpretation should reflect our society's significant, although at times halting, progress toward the elusive goal of equal justice.

The climate of the era when *L.* 1869, *c.* 285, *P.* 806, was enacted was the post-Civil War industrial boom where rapid transportation of raw materials was of paramount importance. Enlarging the nation's railroad network also played a leading part in the momentous industrial push which propelled the United States into the select group of world superpowers. It was not mere coincidence that May 10, 1869 was the date the golden spike was driven in at Promontory Point, near Ogden, Utah, signaling the completion of the first transcontinental railroad. It was a time of railroad ascendency, even supremacy.

The setting of 1978 is vastly different. Today, trucking is every bit as important as railroads in making our industrial machine work. Automobiles and airplanes have gained pre-eminence in the transportation field. There is no rational basis for concluding that it is more burdensome to patrol

thousands of miles of railroad track than it is to safely traverse the millions of highway miles on which trucks operate. *Cf. Egan, supra,* 29 *N. J.* at 253.

Moreover, the meaning of the Equal Protection Clause of the Fourteenth Amendment has not been stagnant. Since the holding in the famous *Slaughterhouse Cases,* 83 *U. S.* 36, 16 *Wall.* 36, 21 *L. Ed.* 394 (1873) which upheld a Louisiana statute granting a 25 year monopoly to one corporation "to maintain slaughterhouses" in three parishes, the scope of coverage of the Equal Protection Clause has expanded. Those cases held that the clause had a very limited reach.

> We doubt very much whether any action of a state not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision. It is so clearly a provision for that race and that emergency, that a strong case would be necessary for its application to any other. But as it is a State that is to be dealt with, and not alone the validity of its laws, we may safely leave that matter until Congress shall have exercised its power, or some case of State oppression, by denial of equal justice in its Courts, shall have claimed a decision at our hands.
>
> [16 *Wall.* at 81, 21 *L. Ed.* at 410]

While the language of the Fourteenth Amendment was not changed over the years, the legal significance attributed to its words certainly has. Today, the *Slaughterhouse Cases* would be considered bad law.

In numerous instances our courts have reassessed an old decision to see if it can withstand the scrutiny of modern thought. In *Brown v. Board of Education of Topeka,* 347 *U. S.* 483, 74 *S. Ct.* 686, 98 *L. Ed.* 873 (1954), the United States Supreme Court did just that. The Court held that the doctrine of "separate but equal," which had been found constitutionally acceptable in *Plessy v. Ferguson,* 163 *U. S.* 537, 16 *S. Ct.* 1138, 41 *L. Ed.* 256 (1896), violated the equal protection and due process clauses of the Fourteenth Amendment when applied to schools segregated by race. Changing conceptions of equal protection do not denigrate the holdings

of yesteryear. They reflect the changing views of a society far different from that in which the old precedent was born. As Chief Justice Weintraub observed in *State v. Smith*, 37 *N. J.* 481 (1962):

Concepts of justice change. Doctrines, incomprehensible today, were once embraced by judges who in their times were doubtless the epitome of the reasonable man. Surely this is so in long-range retrospect. It is equally true that at the moment of change the choice is not necessarily between dead right and dead wrong. The judicial scene is studded with issues upon which conflicting views command respectable support. When a court alters its course, it is often but a preference, a belief that justice is better served in another way, with no intimation that whoever disagrees must be mean or inane.
[*State v. Smith, supra* at 484]

Moreover, this Court is free to take a more expansive view of the requirements of equal protection under Art. I, para. 1 of the New Jersey Constitution than that taken by the United States Supreme Court in interpreting the command of the Fourteenth Amendment. *Robinson v. Cahill*, 62 *N. J.* 473, 490–491 (1973), *cert.* den. 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219 (1973). Chief Justice Weintraub there observed that

* * * [m]echanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. *Ultimately, a court must weigh the nature of and decide whether the State action is arbitrary.* In that process, *the restraint or the denial against the apparent public justification,* if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. * * *
[62 *N. J.* at 492; emphasis added]

In *Taxpayers Association of Weymouth Tp. v. Weymouth Tp.*, 71 *N. J.* 249 (1976), this Court placed a considerable burden on the Legislature to justify denial of important personal rights

* * * [W]here an important personal right is affected by governmental action, this Court often requires the public authority to demonstrate a greater 'public need' than is traditionally required in construing the federal constitution. Specifically, it must be shown that there is an 'appropriate governmental interest suitably furthered by the differential treatment.' [citations omitted] Even under more traditional approaches, New Jersey has always required a real and substantial relationship between the classification and the governmental purpose which it purportedly serves. [citations omitted]

[71 *N. J.* at 286–87]

By reason of the statutory insulation from liability enjoyed by railroads in New Jersey, a possibly deserving plaintiff is being effectively denied a cause of action for compensation for grievous injuries based on the fortuity that the tortfeasor involved is a railroad. There is no legitimate public purpose supportive of this result. There is no justification for relieving railroads from the obligation to act with reasonable care imposed on almost all other members of society. In fact, the statute as presently written indirectly encourages railroads to be less than careful.

Precedents of this Court deserve respectful consideration, not blind, albeit grudging, adherence. I am unwilling to retain the case law of yesterday where it defeats the logic and needs of today. Mechanical adherence to precedent must never be permitted to defeat the spirit and common sense upon which our system of law is founded. As a noted commentator of modern America has observed:

The denial that men may be arbitrary in human transactions is the higher law . . . . By this higher law all formal laws and all political behavior are judged in civilized societies . . . . This law which is the spirit of law is the opposite of an accumulation of old precedents and new fiats. By this higher law, that man must not be arbitrary, the old law is continually tested and the new law reviewed.

[Walter Lippmann, *The Good Society* (1937) Ch. 15]

Whatever the need for protecting railroads from liability in 1869, before the advent of large-scale insurance and al-

ternative modes of transportation, it does not exist today. Railroads today are hardly nascent enterprises which require special treatment to foster their development, if indeed they ever did.

I must respectfully dissent from that portion of the Court's opinion which upholds *N. J. S. A.* 48 :12–152, a statute which is truly an anachronism leftover from the days when the gruesome sacrifice of human life and limb to the needs of the industrial engine was routinely accepted. The statute makes a classification which is totally arbitrary and lacks any rational relationship to a valid governmental objective under the conditions of this day and age. Its repugnance to modern notions of the proper allocation of the costs of foreseeable harm, in whose development this Court has heretofore been in the vanguard, is too obvious even for statement.

Another troublesome aspect of this case is the utter unfairness of the Court's ruling that only the employees of the defendant railroad may be held responsible for plaintiff's injuries. These individuals may eventually lose their homes in satisfaction of a judgment awarding substantial damages to plaintiff, while their employer remains untouchable. In any similar case not involving a railroad, the standard principle of *respondeat superior* would apply to impose vicarious liability on the employer who is in the best position to minimize the societal harm occasioned by employee negligence. I certainly hope that these employees may be indemnified by the railroad's insurance policy. If they are not, this Court can hardly be said to have done justice. The present holding leaves open the possibility of financial ruin for these employees, while still not fully compensating plaintiff. At the same time, the most responsible party is insulated from liability by a statutory anomaly. The fundamental inequity of this state of affairs underscores the need for a reversal of *Egan*.

By way of observation, I wish to emphasize that any railroad-related injury occurring on or after August 24, 1973 — the effective date of the Comparative Negligence Act, *N. J.*

*S. A.* 2A:15–5.1 — would not be controlled by this case. I would certainly find that where that salutary enactment and this statutory relic conflict, the former would prevail.

*For affirmance as to defendant railroad and reversal and remandment as to defendant employees*—Chief Justice HUGHES, Justices SULLIVAN, CLIFFORD, SCHREIBER and HANDLER and Judge 'CONFORD—6.

*For reversal as to defendant railroad and reversal and remandment as to defendant employees*—Justice PASHMAN—1.