843 A.2d 1120

KATHRYN BUONO, BY HER GUARDIAN AD LITEM VINCENT BUONO AND VINCENT BUONO INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. MICHAEL SCALIA AND LISA SCALIA, DEFENDANTS, AND ALPHONSE SCALIA, DEFENDANT-RESPONDENT.

Argued November 17, 2003—Decided March 29, 2004.

132

*Matthew R. Pomo* argued the cause for appellants (*Doyle & Brady*, attorneys).

*John V. Mallon* argued the cause for respondent (*Chasan, Leyner, Bariso & Lamparello*, attorneys).

Justice VERNIERO delivered the opinion of the Court.

This appeal implicates the doctrine of parental immunity articulated in *Foldi v. Jeffries*, 93 *N.J.* 533, 461 *A.*2d 1145 (1983). The trial court and Appellate Division each concluded that, on the narrow facts presented, the parents in this case are immune from suit. We agree and affirm. We emphasize, however, that the doctrine's scope is limited. It applies only when the underlying conduct involves an exercise of parental authority or the provision of customary child care. Further, even when such conduct is evident, there would be no immunity for injury to the parent's child or to a third party if the circumstances reasonably suggest that the parent has acted willfully, wantonly, or recklessly as those terms are described in this opinion.

I.

These are the essential facts. At midday on June 17, 2000, the residents of a local street in Bayonne were hosting a block party. To accommodate that event, parked cars were removed from the street, which was closed to traffic. Within the enclosed area, about fourteen adults had gathered and several children were riding their bicycles, including Michael Scalia who was five-and-a-half years old. Michael had learned to ride his two-wheel bike, without its training wheels, approximately two months earlier. Alphonse Scalia, the boy's father, was watching his son from an approximate distance of five to eight feet. Michael's mother was at the family home preparing food for the party.

While Michael rode, another resident, Diane Buono, was standing "within arm[']s length" of her daughter, Kathryn, who was then sixteen-months old. As Michael approached Kathryn's posi-

tion, his father yelled to him, "watch out." Unfortunately, Michael did not respond and struck Kathryn with the bike, causing both children to fall to the ground. Engaged in conversation, Diane Buono neither witnessed the accident nor heard Alphonse Scalia shout the warning. As a result of the mishap, Kathryn required an unspecified number of stitches.

Vincent Buono, Kathryn's father, filed suit on behalf of himself and his daughter (collectively, plaintiff), claiming negligence on the part of Michael's parents (collectively, defendant) and Michael himself. Specifically, plaintiff asserted that Michael negligently had ridden his bike, that the Scalias negligently had supervised their son, and that such negligence had caused Kathryn's injuries. After discovery, defendant moved for summary judgment. The trial court granted that motion. It concluded that plaintiff had not overcome the rebuttable presumption that the child, Michael, was incapable of negligence.

Relying on *Foldi, supra,* 93 *N.J.* 533, 461 *A.*2d 1145, the trial court also concluded that the doctrine of parental immunity barred plaintiff's claims against Michael's parents because there was no willful or wanton misconduct attributable to either of them. Plaintiff appealed only the parental immunity issue, arguing that immunity did not apply because the injured child is not a child of a defendant parent, but rather a third party. The Appellate Division affirmed in a reported decision, upholding immunity in favor of defendant. *Buono v. Scalia,* 358 *N.J.Super.* 210, 817 *A.*2d 400 (2003). We granted plaintiff's petition for certification. 177 *N.J.* 489, 828 *A.*2d 917 (2003).

II.

Writing for a unanimous Court in *Foldi,* Justice Garibaldi meticulously recounted the evolution of parental immunity, which we need only summarize here. Historically, courts did not recognize the parental immunity doctrine. *Foldi, supra,* 93 *N.J.* at 536, 461 *A.*2d 1145. One of the earliest reported decisions involving the doctrine is *Hewlett v. George,* 68 *Miss.* 703, 9 *So.* 885 (1891),

*overruled by Glaskox v. Glaskox,* 614 `So.2d 906 (Miss.1992). In *Hewlett,* the court held that an unemancipated child could not sue her parents for personal injuries. *Id.* at 887. The court grounded its conclusion on the public policy favoring family tranquility. *Ibid.* Numerous states then adopted the parental immunity doctrine and "applied it to both negligent and intentional torts." *Foldi, supra,* 93 *N.J.* at 537, 461 *A.*2d 1145 (citing *Prosser, Torts,* § 122 at 865 (4th ed.1971)).

New Jersey first adopted the parental immunity doctrine in *Reingold v. Reingold,* 115 *N.J.L.* 532, 181 *A.* 153 (E. & A.1935), *overruled in part by France v. A.P.A. Transp. Corp.,* 56 *N.J.* 500, 267 *A.*2d 490 (1970). In *Reingold,* the court cited policy concerns relating to family tranquility similar to the concerns announced in *Hewlett. Id.* at 534–35, 181 *A.* 153. The court held that an unemancipated minor could not sue her parent for personal injuries due to negligence. *Id.* at 537, 181 *A.* 153.

Thirty-five years later, in *France, supra,* this Court curbed the doctrine significantly. 56 *N.J.* at 506–07, 267 *A.*2d 490. In that case, two unemancipated children were passengers in an automobile driven by their father. *Id.* at 501–02, 267 *A.*2d 490. After the automobile collided with a tractor-trailer, litigation ensued on the children's behalf. *Ibid.* The owner of the tractor-trailer asserted a claim for contribution based on the father's alleged negligence. *Id.* at 502, 267 *A.*2d 490. Rejecting the father's immunity defense, we permitted the owner's claim. *Id.* at 507, 267 *A.*2d 490. Although we noted that academic writers "have condemned parent-child immunity[,]" we recognized that there "may be areas involving the exercise of parental authority ... which should not be justiciable in a court of law." *Id.* at 506–07, 267 *A.*2d 490.

We more fully explained that narrow concept of immunity in *Foldi, supra,* 93 *N.J.* 533, 461 *A.*2d 1145. There, the Court held that the parental immunity doctrine would "preclude liability in cases of negligent supervision, but not for a parent's willful or wanton failure to supervise his or her children." *Id.* at 549, 461 *A.*2d 1145. Further, the Court stated that the doctrine would be

applicable only in "special situations that involve the exercise of parental authority and customary child care." *Id.* at 551, 461 *A*.2d 1145. The Court reached its determination by evaluating two competing principles, still relevant today. The first tenet is "that liability ordinarily should be imposed upon those who wrongfully injure others." *Id.* at 544, 461 *A*.2d 1145. The second is that parents have a right to raise their children in accordance with their own beliefs without undue interference from the courts. *Id.* at 545, 461 *A*.2d 1145. In a lengthy but critical passage, the Court observed:

There are certain areas of activities within the family sphere involving parental discipline, care, and control that should and must remain free from judicial intrusion. Parents should be free to determine how the physical, moral, emotional, and intellectual growth of their children can best be promoted. That is both their duty and their privilege. Indeed, every parent has a unique philosophy of the rearing of children. That philosophy is an outgrowth of the parent's own economic, educational, cultural, ethical, and religious background, all of which affect the parent's judgment on how his or her children should be prepared for the responsibilities of adulthood. Such philosophical considerations come directly to the fore in matters of parental supervision.

There is no recognized correct theory on how much freedom a parent should allow his or her children. Some parents believe that a child must be made self-reliant at an early age and accordingly give their children a great deal of independence. To outsiders, such independence may look like indifference or neglect. On the other hand, some parents believe that their children must be vigilantly monitored from infancy through adolescence. To outsiders, such vigilance and concern may appear to shelter the children from the world and to thwart their development.

As each parent is different, so is each child. There is no one ideal "formula" for how much supervision a child should receive at a given age. What may be perfectly safe to entrust to one five year-old may be utterly dangerous in the hands of another child of the same age. This disparity often proves true even among siblings in the same household. The parent is clearly in the best position to know the limitations and capabilities of his or her own children. These intangibles cannot be adequately conveyed within the formal atmosphere of a courtroom. Nor do we believe that a court or a jury can evaluate these highly subjective factors without somehow supplanting the parent's own individual philosophy.

[*Id.* at 545–46, 461 *A*.2d 1145.]

The *Foldi* Court concluded that that latter principle regarding parental autonomy justified retention of immunity in certain circumstances. *Id.* at 546, 461 *A*.2d 1145. The Court made clear, however, that such immunity is limited. As already

mentioned, it does not apply unless a matter implicates customary child-care issues or a legitimate exercise of parental authority or supervision. Nor does it apply when the parent's conduct is willful or wanton, which the Court defined as an "intermediary position between simple negligence and the intentional infliction of harm." *Id.* at 549, 461 *A.2d* 1145 (citing *Prosser, supra,* § 34 at 184–86). For behavior to fall within that definition, a parent must be "conscious ... that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, [the parent] consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result." *Ibid.* (internal quotation marks and citation omitted).

 Included within the "willful or wanton" concept is recklessness. We take this occasion to describe that term more specifically. By recklessness we mean conduct that

> involves a greater degree of fault than negligence but a lesser degree of fault than intentional wrongdoing....
>
> The ordinary meaning of the word [*recklessness* ] is a high degree of carelessness. It is the doing of something which in fact involves a grave risk to others, whether the doer [realizes] it or not. The test is therefore objective and not subjective.
>
> [*Black's Law Dictionary* 1277 (7th ed.1999) (internal citation and quotation marks omitted) (first alteration in original).]

Ultimately, whether conduct implicates parental decision-making, or whether it satisfies the "willful or wanton" exception to the immunity doctrine, will depend on the totality of circumstances in a given case, subject to a fact-sensitive analysis by the trial judge and, when warranted, by a jury.

Although the case law focuses on suits brought by children against their parents for bodily injury, some of the prior decisions have involved claims by other defendants against the injured child's parents for contribution. *Foldi* itself touched on such a claim against the parents of the child in that case. After a neighbor's dog bit the child, we barred the child's claim against her parents and also barred the neighbor's third-party claim against the parents for indemnity. *Foldi, supra,* 93 *N.J.* at 535–

36, 461 *A*.2d 1145. In explaining the allocation of liability involving third-party joint tortfeasors, we stated:

> [T]he comparative fault of parents guilty of willful or wanton misconduct should be factored into the allocation of liability in cases involving third-party joint tortfeasors. Although it would perhaps be fairest to those third parties to consider the parent's contributory fault in all cases, we draw a line for policy reasons ... that takes into account at least *some* of their interests. Hence, we go further than the line of purely intentional torts by also removing willful or wanton supervisory misconduct from the protective boundary of immunity. Thus, third-party claims may properly be brought against parents in appropriately severe lack-of-supervision cases.
>
> [*Id.* at 548–49, 461 *A*.2d 1145 (internal citations omitted).]

Following *Foldi*, the Appellate Division has been careful in confining immunity to appropriate circumstances. A good illustration is *Murray v. Shimalla*, 231 *N.J.Super.* 103, 555 *A*.2d 24 (App.Div.1989). In that case, a ten-year-old boy, Keith Murray, brought suit against his father following an accident involving gasoline. *Id.* at 105, 555 *A*.2d 24. Keith and two other boys "were using gasoline to make a fire in a wooded area behind the Murray home. The boys had obtained the gasoline from an unlocked storage shed on the Murray property." *Ibid.* The court explained that, as a matter of family practice, Keith's father would permit his son "to fill the gas tank of [the son's] all terrain vehicle (ATV) with the gasoline that was stored in the shed[.]" *Id.* at 108, 555 *A*.2d 24.

On those facts the Appellate Division affirmed the trial court's denial of the father's motion for summary judgment. *Id.* at 111, 555 *A*.2d 24. In so doing, the court articulated an analytical framework useful for determining application of the parental immunity doctrine. The panel explained:

> The first step in applying the *Foldi* analysis requires the judge to determine what acts or omissions by the parent a fact finder could reasonably find were the proximate cause of the child's injury. The next step is to determine whether that conduct is protected by parental immunity, i.e., whether it involves the exercise of parental authority or the provision of customary child care. If it does, the next step is to determine whether the conduct constitutes a lack of parental supervision. If it does, the final step is to determine whether a fact finder could reasonably find that the conduct was willful or wanton thereby removing it from the immunity.
>
> [*Id.* at 106, 555 *A*.2d 24.]

Applying that framework to the case before it, the *Murray* court indicated that

> a jury could reasonably find that plaintiff's injury was proximately caused by defendant's negligence in two distinct though related respects. First, a jury could find that defendant unreasonably exposed children, including plaintiff, to the risk of injury when he stored gasoline, an extremely dangerous substance when misused by children, on the floor of a shed that he left unlocked. Second, a jury could find that defendant unreasonably exposed plaintiff to the risk of injury from the misuse of gasoline by permitting him access to and the use of gasoline for his ATV without parental supervision.
>
> [*Id.* at 108–09, 555 A.2d 24.]

The panel further indicated that even if the father's conduct fell within a protective sphere of parent decision-making, the court was "not prepared on this record to conclude that plaintiff will be unable to prove that defendant's conduct was willful or wanton." *Id.* at 110, 555 A.2d 24. The court concluded that unless further discovery revealed otherwise, the case should proceed to trial. *Id.* at 111, 555 A.2d 24.

Similarly, the Appellate Division found no parental immunity in *Mancinelli v. Crosby*, 247 *N.J.Super.* 456, 589 A.2d 664 (1991). In *Mancinelli*, two children were crossing the street in Point Pleasant Beach with their parents. "Despite the presence of controlled intersections with marked pedestrian crosswalks to their north and south along Ocean Avenue, the [parents] decided to cross in the middle of the block." *Id.* at 458, 589 A.2d 664. A car struck one of the children and her mother. *Ibid.* The car's owner and driver sought contribution from the parents who asserted parental immunity as a bar to the claim. *Id.* at 458–59, 589 A.2d 664.

In rejecting the immunity defense, the court determined that the case did not involve "an intrusion into 'those highly subjective factors' involving a parent's philosophy of child care and supervision. The only judgment involved [was] how to safely cross a street, not how to care for or rear a child." *Id.* at 463, 589 A.2d 664 (internal citations omitted). The court found no "showing of any countervailing policy ... which justifie[d] shielding the mother from tort liability." *Ibid.* That conclusion is consistent with *France, supra,* in which parental immunity was held inapplicable

in a case in which the child's injury resulted from the parent's "negligent operation of a motor vehicle." 56 *N.J.* at 507, 267 *A.*2d 490. Crossing a street, driving a car, and a multitude of similar activities simply do not implicate legitimate child-rearing issues and, therefore, fall outside the purview of the immunity doctrine.

## III.

We hold that application of the above tenets should result in parental immunity on the narrow facts before us. As the Appellate Division reasoned, although this might be the first instance of applying the doctrine to a situation involving a third-party claim (other than a claim from a joint tortfeasor), such application flows naturally from *Foldi's* existing policy rationale. We adopt the Appellate Division's reasoning as our own:

[W]e have found no reported decision in which *Foldi* has been discussed by New Jersey courts in connection with the issue of whether it immunizes parents for negligent supervision claims brought by or on behalf of persons other than their own children. *Foldi* of course acknowledges that policy concerns may properly drive necessary modifications of common law immunities. Despite this lack of reported authority since *Foldi*, the policy concerns embraced in *Foldi* in our view provide determinative guidance here. The Court embraced respect for differences in parenting philosophies and for the degree to which parents understand the uniqueness of their own children. Regardless of whether the person who seeks recovery for parents' apparent failure to keep their [children] from causing harm is a family member, these two policy concerns, outlined in *Foldi*, work to insulate Alphonse Scalia from scrutiny by judge or jury.

[*Buono, supra*, 358 *N.J.Super.* at 219–20, 817 *A.*2d 400 (footnotes omitted).]

Unlike driving a motor vehicle or crossing a street, the conduct here falls within the purview of parental philosophy involving a child's upbringing, entitling defendant to immunity as a matter of law. Alphonse Scalia determined that his five-and-a-half-year-old child could ride a bike within the confines of a neighborhood block party, in the presence of Scalia himself, and in the presence of other parents presumably supervising their own children. That was a valid exercise of parental decision-making entitled to judicial deference. Giving plaintiff all favorable factual inferences, *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995), there is no reasonable suggestion that Michael's father

acted willfully, wantonly, or recklessly as those terms are described in this opinion. The inattention, if any, of Alphonse Scalia was brief, making him at worst merely negligent. Under those circumstances, the trial court did not err in granting defendant's motion.

A contrary holding would lead to the incongruent result that *Foldi* would prevent suit against Kathryn's mother but not against Michael's father, although both parents appear to have been exercising the same degree of supervision over their respective children. In that regard, the trial court stated that "[Kathryn's] mother obviously wasn't watching her daughter enough to even see the accident take place, despite the fact that she indicates that she was an arm[']s length away from her daughter." We note the trial court's observation not to suggest any legal fault on the part of Kathryn's mother, but merely to stress that the conduct of each parent clearly "falls within the realm of activities which partake of the everyday exigencies of regular household existence[ ] that [should be] exempted from simple negligence liability[.]" *Foldi, supra,* 93 *N.J.* at 550, 461 *A.*2d 1145 (internal quotation marks and citation omitted).

There are many places, such as playgrounds, picnic areas, and local parks, where parents watch over their children in seemingly safe environments, but unfortunately where mishaps and accidents do occur. If we were to force parents to defend against their negligent but otherwise honest errors of judgment in those settings, then we would risk opening the floodgates of intrusive litigation in precisely the manner that *Foldi* sought to avoid. We echo the Appellate Division's statement that "[o]ur decision today represents, not an attempt to expand immunity, but simply our determination that the immunity declared in *Foldi* embraces the claims alleged by the injured third party in this case that are said to have arisen from the negligent supervision of Michael by his father." *Buono, supra,* 358 *N.J.Super.* at 222–23, 817 *A.*2d 400. That is all that this case denotes.

In other words, we intend today's holding to be as circumscribed as our disposition in *Foldi*, consistent with other post-*Foldi* decisions. For example, as articulated in *Mancinelli*, if a parent's conduct does not implicate legitimate child-rearing issues, but simply places a third party negligently at risk, then there would be no immunity. We reiterate that deciding whether to apply the doctrine requires careful analysis on a case-by-case basis. We are confident that trial courts in their role as gatekeepers are capable of construing the doctrine sensibly to immunize parents when necessary to protect parental decision-making related to customary child care or supervision and, conversely, to deny immunity when the alleged conduct falls outside the contemplation of *Foldi* and the policies underpinning that decision. Along those same lines, courts should interpret the "willful or wanton" exception broadly to bar immunity in all appropriate circumstances.

## IV.

The dissent's lengthy recitation of law review articles and case law critical of the parental immunity doctrine suggests that our colleagues are uncomfortable with not only our disposition here but also with *Foldi's* original holding. In exposing Michael's father to liability for permitting Michael to ride a bicycle at a neighborhood block party, the dissent presumably also would modify *Foldi* at least to the extent of permitting defendant to seek contribution against Kathryn's mother for her alleged parental negligence. Unquestionably, *Foldi, supra,* addressed the third-party indemnity issue, 93 *N.J.* at 548–49, 461 *A.*2d 1145, and would require modification if defendant suddenly were thrust into a situation of having to assert a counterclaim against plaintiff.

In that respect, Kathryn was far younger than Michael at the time of the accident and thus arguably more vulnerable, requiring at least as much supervision as Michael, if not more. The critical point is that, as we already have stated, requiring either parent in these circumstances to defend his or her respective conduct would constitute just the kind of judicial intrusion that *Foldi* sought to

prevent. From that perspective, we reject the dissent's view that we have not adequately justified our holding. What the dissenters mistakenly denominate as our lack of reasoning is, in reality, a rationale with which they simply disagree.

That rationale, articulated by the unanimous Court in *Foldi* and cited at length elsewhere in this opinion, retains its currency for the narrow class of cases to which we have adverted, including the case before us. To reiterate our earlier stated belief, the conduct of each party here "falls within the realm of activities which partake of the everyday exigencies of regular household existence[ ] that [should be] exempted from simple negligence liability[.]" *Ante* at 142, 843 *A*.2d at 1127 (internal quotation marks and citation omitted) (alteration in original). That belief is grounded in a judicial policy that seeks merely to define the limited circumstances under which parents can rear their children free "from scrutiny by judge or jury." *Buono, supra,* 358 *N.J.Super.* at 220, 817 *A*.2d 400.

To a certain extent, this dispute requires the Court to weigh competing questions, not least of which is the question of how to allocate resources in a manner that fairly accommodates the judiciary's diverse needs. The approach advocated by the dissent might yield some relief in this one case. Yet, forcing these parties to defend against claims and counterclaims would consume not only their own resources but society's as well. We are not as convinced as the dissenters that incurring such costs to adjudicate child-rearing decisions by Michael's father or Kathryn's mother—decisions that were neither willful nor reckless—reflects a proper balancing of interests. In the last analysis, exposing the parents to liability on the facts in this case would create "not a safer world but one in which people simply [would] avoid socially useful activities." Philip K. Howard, *When Judges Won't Judge, Wall Street Journal,* Oct. 22, 2003, at A20.

As for the adverse legal commentary cited by the dissent, we previously have acknowledged similar commentary, but nonetheless maintained the modicum of immunity articulated in *Foldi.*

For example, the academic writers referred to in *France, supra,* did not dissuade the Court from leaving the door open to some measure of immunity in that case. 56 *N.J.* at 504, 506–07, 267 *A.*2d 490. Likewise, *Foldi, supra,* itself detailed the development of the immunity doctrine, including the many criticisms that it had engendered over the years in New Jersey and in other jurisdictions. 93 *N.J.* at 538–41, 461 *A.*2d 1145. In that sense, the dissenters offer us little that the Court has not already considered in prior decisions.

Moreover, not all commentators are opposed to immunity. *See, e.g.,* Martin J. Rooney & Colleen M. Rooney, *Parental Tort Immunity: Spare the Liability, Spoil the Parent,* 25 *New Eng. L.Rev.* 1161, 1182 (1991) ("Allowing immunity for [ ] parental acts which involve [ ] 'an exercise of parental authority . . .' appears to these authors to be the best compromise between the rights of parents, children and third-parties."). Indeed, we do not go as far as some legal writers who advocate elevating the burden of proof to clear and convincing evidence for plaintiffs trying to overcome the immunity bar. See *id.* at 1183 (advocating elevated burden on plaintiffs "[t]o further ensure that courts do not become overly involved in the autonomous functioning of the family").

We also are satisfied that the limitations described initially in *Foldi* and amplified today will serve their intended purpose. We repeat that any conduct that does not reflect a legitimate child-rearing decision is excluded from the immunity doctrine altogether, preserving in all respects a traditional negligence claim. Even assuming a case does implicate that type of parental decision, there still would be no immunity if the circumstances reasonably suggest that the parent has acted willfully, wantonly, or recklessly. Within that framework, we remain confident that the system will distinguish fairly between cases that require a jury's evaluation and those that do not.

Lastly, contrary to the suggestion of our colleagues, the parental-autonomy rationale underlying immunity has not become outworn, but rather retains its vitality consistent with the balancing

of interests inherent in our analysis. By invoking the parental immunity doctrine and upholding the decisions of the two courts below, we do no more than apply *Foldi* sensibly, within reasonable perimeters. It is the dissent's contrary approach that would, in our view, alter the contours of *Foldi* in a manner not warranted either by the specific facts of this case or by the broader societal interests at stake in this appeal.

## V.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, and WALLACE—4.

*Concurring in part, dissenting in part*—Justices LONG, ZAZZALI and ALBIN—3.

Justice LONG, concurring in part and dissenting in part.

I am in full agreement with that portion of the majority's decision that removes reckless parental conduct from the umbrella of protection afforded by the doctrine of parental immunity. By further narrowing the substance of parental immunity, the Court continues on the course that we charted in *France v. A.P.A. Transport Corp.*, 56 *N.J.* 500, 267 *A.*2d 490 (1970) (permitting suit by child against parent in auto negligence setting) and *Foldi v. Jeffries*, 93 *N.J.* 533, 461 *A.*2d 1145 (1983) (excluding willful or wanton conduct by parents from operation of parental immunity doctrine).

I part company from my colleagues, however, insofar as they have chosen to extend the doctrine to bar the claim of an innocent third-party victim injured by the acts of a child and his parents. Up until now, only dictum in *Foldi* could be looked to as support for the application of the doctrine of parental immunity in a third-party context. In *Foldi*, the third-party case was settled long before the matter reached the Supreme Court. Thus, the few lines devoted to it in the opinion were wholly gratuitous dictum.

There is not even a hint in *Foldi* that the Court ever considered the application of the doctrine of parental immunity to apply in a third-party victim case.

Yet, here the Court has simply adopted the *Foldi* dictum as gospel without explaining why it should be given force and effect, and, more important, without justifying the application of what *Foldi* actually said about third-party tortfeasors to bar the claims of third-party victims. In the face of that expansion, the majority's holding is neither "narrow" nor "circumscribed." By its opinion, the Court expands the doctrine to bar the claim of an innocent third-party victim, a position that no other court in New Jersey has ever taken.

I question that conclusion from several perspectives. First, the doctrine of parental immunity has come under nearly universal criticism by legal scholars, who challenge its vitality in twenty-first century America, both in connection with the rationale underlying it and its harsh effects. Joseph J. Basgier, III, *Children's Rights: A Renewed Call for The End of Parental Immunity in Alabama and Arguments for The Further Expansion of A Child's Right To Sue*, 26 *L. & Psychol. Rev.* 123, 123 (2002) (declaring parental immunity a doctrine "whose time has passed"); Harlin Ray Dean, Jr., *It's Time to Abolish North Carolina's Parent–Child Immunity, But Who's Going To Do It?—Coffey v. Coffey and North Carolina General Statutes Section 1-539.21*, 68 *N.C. L.Rev.* 1317, 1317 (1990) (recognizing that immunity is not "good for all time"); Martin J. Rooney & Colleen M. Rooney, *Parental Tort Immunity: Spare the Liability, Spoil the Parent*, 25 *New Eng. L.Rev.* 1161, 1184 (1991) (recommending "a middle of the road approach which recognizes that a parent has a duty in tort to the child, and which allows suit where the plaintiff has shown by clear and convincing evidence that the act complained of does not fall within the retained immunity for parental acts involving instruction and discipline or the provision of necessities...."); Melissa B. Gosart–Convertito, Casenote, *Ascuitto v. Farricielli: Connecticut's Failure To Reform Familial Tort Liability*, 19 *Quinnipiac L.Rev.* 581,

620 (2000) (states should completely abolish doctrine of parental immunity); Sandra L. Haley, Comment, *The Parental Tort Immunity Doctrine: Is It A Defensible Defense?*, 30 *U. Rich. L.Rev.* 575, 603 (1996) (flimsy rationales for doctrine and unjust results of its application have rendered it "anachronism"); Sean S. Modjarrad, Comment, *Hartman v. Hartman: Is "Parental Immunity" Recognized?*, 22 *Am. J. Trial Advoc.* 463, 463–64 (1998) (noting that movement to abrogate parental immunity is so extensive that viability of doctrine is questionable).

Moreover, "[t]oday a majority of jurisdictions have either completely abrogated parental immunity or have restricted its application." Jonathan Cardi, *Apportioning Responsibility To Immune Nonparties: An Argument Based on Comparative Responsibility and the Proposed Restatement (Third) of Torts*, 82 *Iowa L.Rev.* 1293, 1314 (1997); *see, e.g., Hebel v. Hebel*, 435 *P.*2d 8 (Alaska 1967); *Gibson v. Gibson*, 3 *Cal.*3d 914, 922, 92 *Cal.Rptr.* 288, 479 *P.*2d 648 (1971) (referring to doctrine as "deadwood"); *Diehl v. Diehl*, 421 *N.W.*2d 884 (Iowa 1988); *Anderson v. Stream*, 295 *N.W.*2d 595 (Minn.1980); *Hartman by Hartman v. Hartman*, 821 *S.W.*2d 852 (Mo.1991) (abrogating parental immunity); *Guess v. Gulf Ins. Co.*, 96 *N.M.* 27, 627 *P.*2d 869 (1981); *Falco v. Pados*, 444 *Pa.* 372, 376, 282 *A.*2d 351 (1971) (doctrine serves "no rational purpose"); *Elam v. Elam*, 275 *S.C.* 132, 136, 268 *S.E.*2d 109 (1980) (abolishing parent-child immunity, calling the family harmony rationale "specious"). In the face of that movement, for this Court to extend parental immunity to bar third-party victims from redress places us in stark opposition to the direction of our nation's jurisprudence.

It is further well-established that "[w]hen ... a rule is the product of a conceptualism long ago discarded, is universally criticized by scholars, and has been qualified or abandoned in many jurisdictions, it should receive the most careful scrutiny." *Hawkins v. United States*, 358 *U.S.* 74, 81, 79 *S.Ct.* 136, 3 *L.Ed.*2d 125 (1958) (Stewart, J., concurring). In applying and expanding *Foldi's* dictum, without seriously questioning it, the majority has

not only violated that precept but has failed to account for the rule of strict construction that universally applies where immunity is concerned. *See Eden v. Conrail,* 87 *N.J.* 467, 471, 435 *A.*2d 556 (1981) (noting that "this railroad immunity statute, like all immunity enactments, must be strictly construed"); *Potter v. Charles V. Finch & Sons,* 76 *N.J.* 499, 502, 388 *A.*2d 614 (1978) ("[I]mmunity from tort liability is not favored in the law since it bars the injured person from the recovery of compensatory damages against the party who is otherwise responsible for the injury. For that reason, [immunity] statutes ... must be strictly construed and not extended beyond their plain meaning.") (citations omitted). By widening the margins of the doctrine to include innocent third parties, the majority has violated the goal that strict construction was meant to achieve—the cabining-off of immunity.

I note as well that after the initial justifications for parental immunity (family harmony, deterrence of fraud and collusion, and protection of the family's coffers) were debunked, *Foldi, supra,* 93 *N.J.* at 545, 461 *A.*2d 1145 (citing *Immer v. Risko,* 56 *N.J.* 482, 267 *A.*2d 481 (1970) and *Merenoff v. Merenoff,* 76 *N.J.* 535, 388 *A.*2d 951 (1978)), courts began to explain the doctrine in terms of parental autonomy. *France, supra,* 56 *N.J.* at 505, 267 *A.*2d 490; *Foldi, supra,* 93 *N.J.* at 547, 461 *A.*2d 1145. As the majority recognizes, that theory has its limits. Honoring a parent's authority over the physical, moral, emotional, and intellectual growth of children is based on the judgment that a parent's "philosophy" of child rearing requires deference. That is quite different from giving a parent a free pass regarding issues that do not implicate the subjective exercise of that philosophy. *See, e.g., Mancinelli v. Crosby,* 247 *N.J.Super.* 456, 463, 589 *A.*2d 664 (App.Div.1991) (allowing child to cross street in unsafe manner is not insulated by parental immunity). I view this case as falling squarely within the *Mancinelli* rationale.

But even if it is characterized as a legitimate autonomy case, suit should not be barred. The exercise of parental autonomy should, at most, insulate parents from suit by their own children

but should not allow them to escape liability when an improper choice is made and a third-party suffers harm. Whatever the balance of interests may be in a case between parent and child, it is clear that when parental autonomy is balanced against the right of an innocent third-party victim to redress, that autonomy must yield.

Finally, it seems to me that the majority's invocation of the old saw about the "floodgates of intrusive litigation" should be taken with a grain of salt. Our courts exist so that innocent victims may be made whole for the injuries they have sustained at the hands of others. By rejecting the expansion of parental immunity that the majority here approves, that salutary goal would be advanced. The fear of increased filings pales in comparison.

Justices ZAZZALI and ALBIN join in this opinion.