LAURA FERNANDEZ, INDIVIDUALLY AND AS GUARDIAN *AD LITEM*, ETC., PLAINTIFF-APPELLANT, CROSS-RESPONDENT, v. RUDOLPH J. BARUCH, DEFENDANT-RESPONDENT, CROSS-APPELLANT, AND JOSEPH JUDD, JR., DEFENDANT-RESPONDENT, CROSS-APPELLANT.

Argued February 6, 1968—Decided June 28, 1968.

128

*Mr. Nicholas Conover English* argued the cause for the defendant - respondent, cross - appellant, Rudolf J. Baruch (*Messrs. McCarter & English,* attorneys; *Mr. Nicholas Conover English* on the brief).

*Mr. H. Curtis Meanor* argued the cause for the defendant-respondent, cross-appellant, Joseph Judd, Jr. (*Messrs. Lamb, Blake, Hutchinson & Dunne,* attorneys).

*Mr. Leslie S. Kohn* argued the cause for the plaintiff-appellant, cross-respondent (*Mr. Milton S. Yormark,* attorney).

The opinion of the Court was delivered

PER CURIAM. In this wrongful death action, the widow of Pedro Fernandez, as administratrix *ad prosequendum,* alleges that his suicidal death was due to the malpractice of the defendant psychiatrists. A jury verdict in plaintiff's favor was reversed by the Appellate Division and the case was remanded for a new trial. 96 *N. J. Super.* 125 (1967). We granted cross-petitions for certification. 50 *N. J.* 403 (1967).

The facts are set forth in detail in the Appellate Division's opinion. Pedro Fernandez was taken to the Elizabeth General Hospital by the police after he was arrested for making an unprovoked attack upon a friend and attacking and biting two bystanders who attempted to help subdue him. At the hospital he came under the care of defendant doctors who found him to be mentally ill and in need of extensive treatment at a mental institution. They concluded that he possessed "violent and homicidal tendencies." Though the version given by the widow and her brother differs from that given by the defendants, it is clear that the widow was made aware of the defendants' belief that her husband's condition required his commitment to a mental hospital and that she declined to sign commitment papers. Because the Elizabeth General Hospital did not have the staff and facilities to administer the lengthy treatment necessary for Mr. Fernandez,

after about 18 days at the hospital he was returned to the custody of the police who had requested his detention. At this time he was calm and rational, displaying no symptoms of violence. Four days later, while confined in the Union County Jail, Mr. Fernandez hanged himself with his elastic socks.

Plaintiff's case was based on three theories of malpractice liability: (1) that the defendant doctors should have taken steps to make certain that Mr. Fernandez was transferred directly to a mental institution; (2) that the defendant doctors should not have placed him in the custody of the police; and (3) that the defendant doctors should have informed the police that the deceased, although then calm, was suffering from a dangerous mental condition with homicidal-suicidal tendencies, and should have advised the police of the need to continue the administration of a tranquilizing drug, Thorazine, and should have told them of the effects of its discontinuance. The Appellate Division held that the first two theories were insufficient to support plaintiff's verdict and remanded the case for a new trial on the third theory.

We agree with the Appellate Division's disposition of the first two theories for the reasons set forth in its opinion. However, we conclude that the third theory of liability is also insufficient and that the trial court therefore erred in failing to grant defendants' motion for a judgment of dismissal.

The basic question is whether the defendant doctors, in the application of accepted medical practice, knew or should have known that Fernandez presented a suicide risk requiring special precautions. There is no contention that the defendants' diagnostic methods were improper. Rather, it is urged that on the information and diagnosis before them (particularly Fernandez's homicidal tendencies) the doctors should have realized the danger of suicide. The medical expert offered by the plaintiff testified that "one cannot differentiate strictly and say that one case is suicidal and another is

homicidal." He stated it to be his opinion that a patient who exhibited homicidal tendencies also possesses a drive to destroy himself and that if his hostility toward others is frustrated, that hostility would be internalized against himself: "The common denominator is the hostility that exists." Defendants' expert witnesses disagreed with this conclusion. They stated that, under accepted medical practice, a suicide potential does not necessarily accompany homicidal tendencies, and that in fact the two symptoms are antithetical: most homicidal patients would not be suicidal. The Appellate Division found that this conflict in the opinions of the experts was properly to be resolved by a jury.

We think that the testimony of the plaintiff's expert fell short of establishing a medical standard pertaining to the relationship of homicidal and suicidal tendencies and thus the issue should not be considered by a jury. The plaintiff's medical expert did not purport to express accepted medical standards. He prefaced his testimony on the inter-reaction between homicidal and suicidal drives by the statement, "it is my opinion," and did not say that his view represented the view generally accepted in the profession. Of course, much more than the personal opinion of a medical witness is necessary to establish a standard of accepted medical practice. The expert testimony must relate to generally accepted medical standards, not merely to standards personal to the witness. See *Carbone v. Warburton*, 11 *N. J.* 418, 425 (1953). See also, *Schueler v. Strelinger*, 43 *N. J.* 330, 346 (1964). Here, the plaintiff failed to produce evidence upon which the jury could find that the consensus of medical opinion required that the defendant doctors envision a suicide potential solely because a mentally ill patient had exhibited violent tendencies toward others. There was no other evidence in the case to show that the doctors should have anticipated that Fernandez would attempt to destroy himself. No prior history of suicide attempts was shown, and no evidence was produced to indicate that the deceased had manifested to the doctors any desire to kill himself.

The controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is whether the defendants reasonably should have anticipated the danger that the deceased would attempt to harm himself. See Annotation *Civil Liability for Death by Suicide,* 11 *A. L. R.* 2d 751, 782–92 (1950) and cases cited therein. Since there was no proof that generally accepted medical standards required the defendant doctors to conclude that Fernandez was likely to attempt suicide, they cannot be said to be guilty of malpractice in not predicting to the police that the decedent might attempt to do away with himself. See Perr, *Suicide Responsibility of Hospital and Psychiatrist,* 9 *Clev.-Mar. L. Rev.* 427 (1960); see generally, Morse, *The Tort Liability of the Psychiatrist,* 18 *Syracuse L. Rev.* 691, 707–15 (1967).

There was no evidence in the case remotely suggesting that the defendants violated accepted standards of medical practice in discontinuing the use of the drug Thorazine. The evidence showed that this drug, a tranquilizer, had been administered to Mr. Fernandez in relatively small dosages during his 18-day stay at the hospital and was last administered about 12 hours before his discharge. Both defendant doctors testified that in their judgment there was no need thereafter to continue the medication. On cross-examination, plaintiff's medical expert agreed that the amount of the drug to be used and the duration of its use were matters of professional judgment for the treating physician. On this record a jury would not be justified in finding that the defendants' decision to terminate the use of Thorazine constituted malpractice.

Plaintiff contends that even if the doctors acted reasonably in discontinuing the use of the drug Thorazine, accepted medical standards required that they should have informed the police that the drug had been used and that its discontinuance might result in the building up of tensions in Mr. Fernandez. The plaintiff's medical expert testified that 24 to 36 hours after the last dosage of Thorazine an

"explosive feeling" and tension would develop in the patient. However, there was no evidence that the defendant doctors should have concluded that taking Mr. Fernandez off Thorazine would lead to any suicidal risk. As the evidence did not show that decedent's condition—including the withdrawal from Thorazine—presented a risk that he would take his own life, the defendant doctors were under no duty, for the purpose of preventing suicide, to inform the police of their treatment. See *Rawdin v. Long Island Home, Ltd.*, 21 *A. D. 2d* 909, 251 *N. Y. S. 2d* 756 (1964), affirmed mem., 16 *N. Y. 2d* 636, 261 *N. Y. S. 2d* 76, 209 *N. E. 2d* 118 (1965); *Katz v. State*, 46 *Misc. 2d* 61, 258 *N. Y. S. 2d* 912 (*Ct. Cl.* 1965).

Because the evidence failed to show that the decedent had a suicidal proclivity of which the defendant doctors were or should have been aware, we conclude that no case of malpractice was presented against them. Accordingly, defendant's motion for a judgment of dismissal should have been granted.

The judgment of the Appellate Division is reversed and the cause is remanded to the trial court for the entry of judgment for the defendants.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7

*For affirmance*—None.