875 A.2d 1035 (2005)
378 N.J. Super. 371
Craig S. MARSHALL, Administrator Ad Prosequendum of the Estate of Ellen S. Marshall, Deceased, Plaintiff-Appellant,
v.
Vladimir KLEBANOV, M.D., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 2005.
Decided June 22, 2005.
*1036 Alex Lyubarsky, Woodbridge, argued the cause for appellant (Wilentz, Goldman & Spitzer, attorneys; Barry A. Cooke, of counsel, and Mr. Cooke and Mr. Lyubarsky, on the brief).
Alan J. Baratz, Parsippany, argued the cause for respondent (Weiner, Lesniak, attorneys; Mr. Baratz, of counsel; Mr. Baratz and Adam Kenny, on the brief).
Before Judges LEFELT, ALLEY and FUENTES.
The opinion of the court was delivered by
LEFELT, J.A.D.
Ellen Marshall, a thirty-six year old married mother of two young sons, hanged herself two days before a scheduled appointment with her psychiatrist, defendant Vladimir Klebanov. Her husband, plaintiff Craig Marshall, sued defendant on behalf of himself and his wife's estate for malpractice and wrongful death. Plaintiff now appeals from the motion judge's summary judgment, which concluded that defendant psychiatrist, pursuant to N.J.S.A. 2A:62A-16, was statutorily immune from liability for Mrs. Marshall's suicide. We disagree that defendant's conduct warranted immunity under the statute, and we reverse and remand.
Here are the facts and relevant procedural history. In late December 1999, Mrs. Marshall told her mother that if anything were to happen to her, she wanted *1037 her mother to know she was a good mother. She also told her sister that she could not take it anymore. Concerned about Mrs. Marshall's despondency, her mother and sister drove to an office Dr. Klebanov was opening in Old Bridge to inquire whether the doctor would be willing to treat Mrs. Marshall. Mrs. Marshall's mother told the doctor that her daughter had suicidal tendencies and they were very worried about her. No appointment was made, however, because the doctor's office was not yet ready to service patients.
Mrs. Marshall subsequently called the doctor and scheduled an appointment for January 7, 2000, the first day defendant's office was open to patients. Mrs. Marshall noted in her initial questionnaire that her last medical examination was in 1999, and that she was taking Prozac (an antidepressant) daily. She also noted a family history of anxiety attacks, fears or phobias, depression, and suicide attempts.
While supplying intake information to defendant, Mrs. Marshall informed the doctor that she had tried to kill herself twice, with the last attempt occurring in 1997. She was treated, at that time, with Prozac and Wellbutrin and began to feel better again. Two months before the appointment with defendant, however, Mrs. Marshall suffered another episode of depression.
Dr. Klebanov noted that Mrs. Marshall had suicidal thoughts, without any current plan to take her life. He diagnosed her with major depression, recurrent, and severe. He also found that she suffered from depressed mood, blunted affect, poor insight, and poor judgment. The doctor increased Mrs. Marshall's Prozac dose, maintained the Wellbutrin, added Lithium, and determined that it was necessary to see her weekly. Consequently, the doctor scheduled another appointment for January 14, 2000. Mrs. Marshall paid the doctor $150 for the completed session.
One week later, Mrs. Marshall returned to defendant's office for her scheduled appointment, but was not seen by the doctor. The reason she was not seen is disputed. According to plaintiff, Dr. Klebanov's receptionist, who is also the doctor's wife, turned Mrs. Marshall away because she did not have a check with her, even though she offered to pay by credit card. Plaintiff also claimed that in a subsequent telephone conversation on that day with the doctor, he agreed to see Mrs. Marshall, but only after plaintiff guaranteed payment.
Dr. Klebanov disagreed with plaintiff's account of what occurred on January 14, and claimed to never refuse treatment of patients who cannot pay. He asserted that after being told that the office was not equipped to accept credit cards, Mrs. Marshall told the receptionist that she did not yet have confirmation of insurance and could not afford to pay for the session. The receptionist suggested that she nevertheless speak with the doctor about her medications, but Mrs. Marshall refused and claimed to be feeling well enough to wait until she obtained insurance confirmation in a couple of weeks.
Whatever actually occurred on January 14, it is undisputed that later that day, the doctor called to inquire why Mrs. Marshall had not kept her appointment. Subsequently, on that day, defendant and plaintiff spoke, and the doctor some time thereafter made an appointment with Mrs. Marshall for February 4, 2000, which was almost one month after the initial session. Tragically, two days before this appointment, on February 2, 2000, Mrs. Marshall hanged herself.
Plaintiff claims that Dr. Klebanov committed malpractice by abandoning his patient and not providing her with *1038 appropriate treatment. Plaintiff's expert supported this position and opined that "[a]lthough [defendant] appropriately assessed the high risk of suicide, he did not take appropriate action to deal with that risk" and defendant's "failure to do so was one major factor that led to Ellen's suicide." Defendant's actions, according to plaintiff's expert, "constitute[d] a deviation from the proper standard of medical and psychiatric care, because he abandoned his patient."
Regardless of plaintiff's expert's opinion, however, the motion judge agreed with defendant that N.J.S.A. 2A:62A-16 shields a mental health professional from liability for deviations from the standard of care in all instances except where the patient's suicide is imminent. The motion judge stated that "the language in the statute is unambiguous" and "N.J.S.A. 2A:62A-16a provides the defendant, Dr. Klebanov, here, with an immunity, so long as one of the two subsections of [b] are not applicable." Because neither the doctor nor Mrs. Marshall's relatives believed her suicide was imminent, the judge concluded that the statute completely immunized defendant from any malpractice claim, and granted defendant summary judgment, dismissing plaintiff's complaint.
Pursuant to N.J.S.A. 2A:62A-16a, any licensed mental health practitioner, including a psychiatrist, "is immune from any civil liability for a patient's violent act against another person or against himself unless the practitioner has incurred a duty to warn and protect the potential victim as set forth in subsection b. of this section and fails to discharge that duty as set forth in subsection c of this section."
The statute specifies in subsection b how the practitioner incurs the duty to "warn and protect." The duty is incurred when the patient communicates to the practitioner "a threat of imminent, serious physical violence against a readily identifiable individual or against himself and the circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out the threat." N.J.S.A. 2A:62A-16b(1). A duty to "warn and protect" can also be incurred when the "circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out an act of imminent, serious physical violence against a readily identifiable individual or against himself." N.J.S.A. 2A:62A-16b(2).
When the practitioner incurs a duty to "warn and protect," he or she can be liable for failing to discharge that duty in the manner specified in subsection c of the law. Thus the practitioner who has incurred such a duty, in accordance with subsection b, can discharge that duty by arranging for the admission or involuntary commitment of the patient into a psychiatric hospital or other appropriate medical care facility, N.J.S.A. 2A:62A-16c(1),(2); by advising local law enforcement of the threat; or by warning the intended victim or the parent or guardian of an intended victim or patient who is a minor. N.J.S.A. 2A:62A-16c(3),(4),(5).
Finally, the statute recognizes that to discharge the duty in the manner it directs, the practitioner, under some circumstances, must disclose confidential information learned from the patient during treatment. Consequently, the law also specifically provides that any practitioner who discharges the duty in the manner directed by the statute "is immune from civil liability in regard to that disclosure." N.J.S.A. 2A:62A-16d.
The purpose of this law is to shield mental health practitioners from liability for making disclosures of confidential information after they have incurred a duty *1039 to warn and protect in the manner specified by the statute. The duty specified is to both warn and protect; it is not a duty to warn or protect. As part of that duty to warn and protect, the mental health practitioner "would be required to disclose confidential information obtained from a patient." Runyon v. Smith, 163 N.J. 439, 441, 749 A.2d 852 (2000). The statute does not deal with all suicides or violent acts against another that may occur during a patient's psychiatric treatment. Unless the case involves a duty to warn and protect, the statute is not implicated. See Runyon v. Smith, 322 N.J.Super. 236, 248-9 n. 1, 730 A.2d 881 (App.Div.1999), aff'd, 163 N.J. 439, 749 A.2d 852 (2000).
Under this statute, a mental health practitioner who incurs a duty to "warn and protect," because the threat of violence is imminent, can be liable for failing to discharge that duty in the manner specified. The practitioner who has not incurred a duty to "warn and protect" under the statute is not liable for failure to "warn and protect," but can be liable for other deviations from the accepted standard of care that are proximate causes of a patient's violent act or suicide. Stated another way, the statute does not establish the only means by which a psychiatrist can be subject to a duty to protect a patient from self-inflicted harm; a duty to protect may arise without a duty to warn.
It is well accepted that "[n]egligence is conduct which falls below a standard recognized by the law as essential to the protection of others from unreasonable risks of harm." Sanzari v. Rosenfeld, 34 N.J. 128, 134, 167 A.2d 625 (1961). "[O]rdinarily when a physician [such as defendant] is charged with negligence in the treatment of a patient, the standard of practice to which he [or she] failed to adhere must be established by expert testimony." Id. at 135, 167 A.2d 625. It has been established that a physician must "safeguard the patient from a reasonably foreseeable self-inflicted injury." Cowan v. Doering, 215 N.J.Super. 484, 495, 522 A.2d 444 (App.Div.1987), aff'd, 111 N.J. 451, 545 A.2d 159 (1988). "The controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is whether the defendant[] reasonably should have anticipated the danger that the deceased would attempt to harm [herself]." Fernandez v. Baruch, 52 N.J. 127, 132, 244 A.2d 109 (1968).
Had the Legislature intended to sweep as broadly as defendant argues and eliminate all liability for suicide for any reason when the threat of suicide was not imminent, even if the threat of suicide was reasonably likely, it would have signaled its intentions with greater clarity. Instead, when the law was introduced in 1990, an introductory statement declared, "State and federal courts are shaping remedies for victims of violent crimes which include a cause of action against licensed practitioners of psychology, medicine or marriage counseling for failing to warn of a patient's potentially violent behavior."[1]Statement to New Jersey Senate S. 3063, (November 19, 1990).
The Legislative statement went on to explain that "[u]nder current law, the therapist's legal responsibility to warn of a patient's potential for violence is unclear.... Thus, a therapist may be placed in the untenable position of being subject to liability under two competing theories: for failing to warn a potential victim ... or, in the alternative ... for disclosing confidential communications between the therapist and the patient." Ibid. The *1040 statement further explained that the "bill serves as a specific guideline for practitioners caught in this quandary and protects them from liability under appropriate circumstances." Ibid.
As Chief Justice Weintraub stated many years ago, our obligation is "to give effect to the obvious purpose of the Legislature, and to that end `words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms.'" New Capitol Bar & Grill Corp. v. Div. of Employment Sec., 25 N.J. 155, 160, 135 A.2d 465 (1957) (quoting Alexander v. New Jersey Power & Light Co., 21 N.J. 373, 378, 122 A.2d 339 (1956)).
The plain purpose of the statute in question is to codify the practitioner's duty to "warn and protect" without fear of violating ethical restraints by disclosing confidential information. That is the codification of "existing professional standards of practice" that Governor Florio referenced in his "Reconsideration and Recommendation Statement." L. 1991, c. 270.[2] The purpose of the statute was not to immunize mental health practitioners from all liability for a patient's suicide, regardless of the reasonable likelihood of suicide or the gravity of the practitioner's deviation from the pertinent standard of care. As the bill indicated, the act provides immunity only from "certain civil suits." Senate Committee Substitute for S. 3063, (adopted March 11, 1991). Under defendant's construction of the statute, for example, a psychiatrist who prescribed the wrong medication that causes the patient to kill herself or another person would not be liable in any civil action. This is not a result the Legislature contemplated.
Plaintiff's expert, in this case, has advanced a standard of care to which plaintiff claims defendant failed to adhere. The contention is that defendant abandoned Mrs. Marshall and consequently failed to take any steps to protect her from suicide. Should a jury find that defendant, in fact, abandoned Mrs. Marshall, failed to treat her with sufficient regularity, and that the failure was a proximate cause of her suicide, defendant would be liable.
We do not necessarily disagree with defendant's contention that what Mrs. Marshall revealed to the doctor and what all of Mrs. Marshall's close relatives observed did not indicate that Mrs. Marshall's suicide was imminent. What concerns us is the absence of any observations by defendant just prior to the suicide. Even though defendant recognized that Mrs. Marshall's condition required weekly monitoring, the doctor failed to treat Mrs. Marshall weekly and instead scheduled an appointment almost one month after his initial session with the patient. If defendant had been following Mrs. Marshall on a weekly basis, as he himself found was necessary, then the immediacy of Mrs. Marshall's suicidal intentions might have been perceived by him and defendant may have incurred a duty to "warn and protect" under the statute. Assuming the truth of plaintiff's proofs, therefore, it was defendant's own negligence that possibly prevented recognition of an imminent suicide threat. Thus, defendant's lack-of-imminence argument is analogous to the "ostrich defense," which is often rejected in federal criminal cases. E.g., U.S. v. Williams, 202 F.3d 959, 963 n. 1 (7th Cir.2000) (defendant "may not escape liability by shutting his eyes for fear of what he would learn" and later plead ignorance).
*1041 Under these circumstances, we conclude that N.J.S.A. 2A:62-16 does not bar plaintiff's negligence action. A jury should assess whether defendant's conduct met the accepted standard of care, and if not, whether the deviation was a proximate cause of Mrs. Marshall's suicide. Safer v. Estate of Pack, 291 N.J.Super. 619, 625, 677 A.2d 1188 (App.Div.), certif. denied, 146 N.J. 568, 683 A.2d 1163 (1996).
Reversed and remanded for further proceedings in conformity with this decision.
FUENTES, J.A.D., dissenting.
I write separately to express my disagreement with the ultimate intellectual underpinning of the majority's decision, that N.J.S.A. 2A:62A-16 was not intended "to immunize mental health practitioners from all liability for a patient's suicide, regardless of the reasonable likelihood of suicide or the gravity of the practitioner's deviation from the pertinent standard of care." Majority op. at 379-80, 875 A.2d at 1040. In my opinion, this conclusion cannot be reconciled with the statute's clear, unambiguous language.
N.J.S.A. 2A:62A-16 provides, in pertinent part, that:
Any person who is licensed in the State of New Jersey to practice psychology, psychiatry, medicine, nursing, clinical social work or marriage counseling, whether or not compensation is received or expected, is immune from any civil liability for a patient's violent act against another person or against himself unless the practitioner has incurred a duty to warn and protect the potential victim as set forth in subsection b. of this section and fails to discharge that duty as set forth in subsection c. of this section.

b. A duty to warn and protect is incurred when the following conditions exist:
(1) The patient has communicated to that practitioner a threat of imminent, serious physical violence against a readily identifiable individual or against himself and the circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out the threat; or
(2) The circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out an act of imminent, serious physical violence against a readily identifiable individual or against himself.

(Emphasis added.)
As the emphasized language indicates, the statute immunizes a mental healthcare practitioner from "any civil liability" for a patient's self-injurious acts, unless he or she has incurred a "duty to warn and protect," as that phrase is defined in subsection "b."
Here, plaintiff's expert Dr. Steven S. Simring, issued a written report critical of defendant's actions in failing to closely monitor decedent, as warranted by the severity of her illness. Dr. Simring characterized defendant's failure to act as an "abandonment," because "the only action Dr. Klebanov took after the second visit failed to occur was to reschedule it three weeks later, ignoring the urgency of Ms. Marshall's psychiatric condition." According to Dr. Simring, the "urgency" of the situation required defendant to have taken actions that could have prevented decedent's suicide.
There were many other actions Dr. Klebanov could have taken that might have prevented Ms. Marshall's suicide. He should have tried to contact her by phone and ask her to come back to his office. If that did not work, he could *1042 have tried contacting her husband or her family. He could have called the local screening center to send a mental health worker to her home. If he felt that Ms. Marshall would not or could not see him as a private patient, he could have arranged for her to be seen at a local emergency room, or even arranged for hospitalization.
* * * *
Although Dr. Klebanov appropriately assessed the high risk of suicide, he did not take appropriate action to deal with that risk. His failure to do so was one major factor that led to Ms. Marshall's suicide. It is my opinion, to a reasonable degree of medical probability, that Dr. Klebanov's actions constitute a deviation from the proper standard of medical and psychiatric care, because he abandoned this patient. He failed to provide her with adequate monitoring and treatment and failed to refer her elsewhere.
(Emphasis added.)
As the emphasized language clearly recognizes, plaintiff's theory of liability is predicated upon defendant's inactions in the face of decedent's "high risk of suicide." While this assessment of defendant's professional conduct unquestionably identifies a deviation from the standard of care expected of a psychiatrist under the common law, Fernandez v. Baruch, 52 N.J. 127, 132, 244 A.2d 109 (1968), it does not meet the higher standard articulated in subsection "b" of the statute, i.e., that "[t]he circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out an act of imminent, serious physical violence against a readily identifiable individual or against himself."
Stated differently, a high risk is not the same as an imminent risk. The word "imminent" refers to an event that is about to occur. In the context of the statute, it speaks of the need to take immediate action in order to avoid the harm described. A "high risk," by contrast, describes the strong likelihood that something may happen. These are not mere semantic distinctions. The language used in the statute delineates a standard that, when satisfied, triggers what is otherwise an unthinkable act by a mental healthcare practitioner: the disclosure of confidential patient information.
The facts here provide a tragic illustration of the difference between "imminent" and "high risk." Had Mrs. Marshall taken her own life upon returning home, the same day she was turned away from her second scheduled treatment visit with defendant, a rational jury could find that the circumstances were such that a reasonable professional in defendant's area of expertise would have believed that she intended to carry out an act of imminent, serious physical violence against herself. N.J.S.A. 2A:62A-16b(2).
Even though under these circumstances there is no actual interaction between doctor and patient, I think sound public policy would not countenance this "ostrich-type" behavior as a defense to this action. That is, a mental healthcare practitioner cannot, through professional malpractice (not seeing the patient), deprive himself of vital information necessary to formulate an opinion about the patient's intentions "to carry out an act of imminent, serious physical violence," and then use this very untenable ignorance as a shield against liability.
Tragically, the pathological forces that led to Mrs. Marshall's demise did not reveal themselves until three weeks after she last saw defendant. Although, under these circumstances, a rational jury could find defendant's failure to see her on the date *1043 of her second visit, coupled with the lack of alternative follow-up measures described by Dr. Simring, created a "high risk" that she would take her own life, unfortunately for plaintiff, that is not the standard of care the Legislature created when it adopted N.J.S.A. 2A:62A-16.
Finally, I disagree with my colleagues that the common law standard of care articulated in Fernandez, supra, survived the adoption of the statute in 1991. The words "immune from any civil liability for a patient's violent act against another person or against himself unless the practitioner has incurred a duty to warn and protect," are sufficiently clear to me that the Legislature intended to create a new and comprehensive standard, thereby abrogating preexisting common law principles.
Here, looking for meaning behind the words of the statute is not only unnecessary, but unwarranted. As the Supreme Court has recently reaffirmed, "[i]f the language is plain and clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms." State of New Jersey Dep't of Envtl. Prot. v. Caldeira, 171 N.J. 404, 415, 794 A.2d 156 (2002) (quoting Tp. of Stafford v. Stafford Zoning Bd., 154 N.J. 62, 71, 711 A.2d 282 (1998)).
I therefore respectfully dissent.
NOTES
[1] The duty to warn was developed in the seminal case, Tarasoff v. Regents of University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).
[2] See McIntosh v. Milano, 168 N.J.Super. 466, 489-90, 403 A.2d 500 (Law Div. 1979), imposing a Tarasoff type duty to protect and warn an intended or potential victim of the patient.