902 A.2d 873

CRAIG S. MARSHALL, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF ELLEN S. MARSHALL, DECEASED, PLAINTIFF–RESPONDENT, v. VLADIMIR KLEBANOV, M.D., DEFENDANT–APPELLANT.

Argued April 3, 2006—Decided July 26, 2006.

*Alan J. Baratz,* argued the cause for appellant (*Weiner Lesniak,* attorneys; *Mr. Baratz* and *Adam Kenny,* on the briefs).

*Alex Lyubarsky,* argued the cause for respondent (*Wilentz, Goldman & Spitzer,* attorneys; *Barry A. Cooke,* of counsel).

Justice ZAZZALI delivered the opinion of the Court.

In this appeal, the Court must decide whether the statutory immunity provisions of *N.J.S.A.* 2A:62A–16 apply to immunize a psychiatrist from liability when it is alleged that the psychiatrist abandoned a seriously depressed patient and negligently failed to provide the patient with adequate monitoring or treatment. In February 2000, thirty-six year old Ellen Marshall, the decedent, hanged herself two days before a scheduled appointment with defendant, Dr. Vladimir Klebanov, a licensed psychiatrist. Following her death, the decedent's husband, plaintiff Craig Marshall,

filed an action against defendant on behalf of himself and his wife's estate for medical malpractice and wrongful death, alleging that defendant deviated from accepted standards of care in the evaluation, care, and treatment of his wife. Defendant moved for summary judgment, asserting that he was immune from liability under *N.J.S.A.* 2A:62A–16, which sets forth a mental health practitioner's "duty to warn and protect" patients or third parties against a patient's violent acts.

The trial court granted defendant's motion for summary judgment based on the plain language of *N.J.S.A.* 2A:62A–16a. On appeal, a divided panel of the Appellate Division reversed. The majority concluded that *N.J.S.A.* 2A:62A–16 does not bar plaintiff's claims, stating that "[t]he purpose of the statute was not to immunize mental health practitioners from all liability for a patient's suicide, regardless of the reasonable likelihood of suicide or the gravity of the practitioner's deviation from the pertinent standard of care." *Marshall v. Klebanov*, 378 *N.J.Super.* 371, 379, 875 *A.2d* 1035 (App.Div.2005). The dissent argued that the majority's conclusion contradicted the statute's plain language. *Id.* at 381, 875 *A.2d* 1035 (Fuentes, J., dissenting). We affirm and hold that the statutory immunity provisions of *N.J.S.A.* 2A:62A–16 do not immunize a mental health practitioner from potential liability when the practitioner abandons a seriously depressed patient and fails to treat the patient in accordance with accepted standards of care in the field.

## I.

Because this matter is before the Court on defendant's motion for summary judgment, we review the facts in the light most favorable to plaintiff, the non-moving party. *R.* 4:46–2(c); *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.2d* 146 (1995). The decedent, Ellen Marshall, was born in 1963 and married plaintiff, Craig Marshall, at age twenty-three. She gave birth to two sons, one in 1992, and one in 1995. In 1997, the family moved from their home in Franklin Park to Marlboro.

Around that time, the decedent developed depressive and suicidal thoughts due to financial concerns. Although she had been diagnosed with psychiatric problems during high school, her psychiatric history indicates that she felt relatively well for many years until she moved in 1997. That year, the decedent was admitted to Riverview Medical Center for approximately one week and placed on "suicide watch" after taking an overdose of prescription medication. Following her release, she was treated with Prozac and Wellbutrin for one year and purportedly felt well until late 1999.

In December 1999, the decedent suffered another episode of depression. According to her sister, around that time the decedent started "slipping." She became socially withdrawn, was losing weight, and was depressed. The decedent's mother states that during that time her daughter was "the worst that [she had] seen her." At one point, the decedent told her mother: "If anything ever happens to me, Mom, I want you to know that you were a good mother." The decedent also told her sister that her children were better off without her.

Because the decedent's mother and sister felt that she needed help, in late December 1999, they went to see defendant, Vladimir Klebanov, a licensed psychiatrist who was opening an office in Old Bridge near the decedent's home. The decedent's mother informed defendant that she had a "sick daughter" with "suicidal tendencies" and that she was "worried about her." Defendant responded that his primary office was in Brooklyn and that the earliest that he could see the decedent would be in the first week of January. He also informed them that if the decedent was suicidal, she should be taken to a hospital. The decedent subsequently called defendant and scheduled an appointment for January 7, 2000, the first day that his office was open to patients.

At the January 7 appointment, the decedent noted in an initial questionnaire that her last medical examination was in 1999 and that she was taking Prozac daily. She further indicated that she had a family history of anxiety attacks, fears or phobias, depression, and suicide attempts. The decedent listed her current

symptoms as including trouble sleeping, fatigue, crying spells, feeling sad or depressed every day, difficulty communicating with others, avoiding social events, difficulty making decisions, suicidal thoughts, periods of tension, and loss of appetite and weight. The decedent also informed defendant that she had tried to commit suicide in the past.

Defendant diagnosed the decedent with "major depression, recurrent, severe." He found that she suffered from depressed mood, blunted affect, poor judgment, and poor insight. He also noted that she had suicidal thoughts but found that "she did not have any plan to commit suicide." According to defendant, "[t]o have suicidal thoughts and to commit suicide are not the same things. There are tons of people who do have suicidal thoughts from time to time at certain points in time but [that does not] mean they commit suicide.... If the patient would have a plan, I [would] hospitalize her immediately." Defendant prescribed Lithium to the decedent to augment the effects of her other medications, increased her dosage of Prozac, maintained her dosage of Wellbutrin, and decided to see her again in one week on January 14, 2000, for follow-up care. Defendant testified that "therapy is a treatment, and to see the patient who has depression is part of the treatment."

On January 14, 2000, the decedent returned to defendant's office for her scheduled appointment but was not seen by the doctor. The reason for that is disputed. Plaintiff contends that, on the day of his wife's appointment, he called his house to check his phone messages and retrieved a message from defendant stating that the decedent failed to attend her appointment. Plaintiff claims that he became "concerned because it didn't seem that she would intentionally miss the appointment because she was looking very forward to seeing him again." As a result, plaintiff called his house again to speak with his wife. The decedent purportedly informed her husband that she did go to defendant's office but was refused treatment because she did not have a check with her to pay for the visit. Both parties agree that the decedent offered to

pay by credit card but that the office was not equipped for such transactions.

Defendant asserts that his office would never refuse treatment of a patient who could not pay. He claims that after the receptionist, defendant's wife, informed the decedent that the office was unable to accept credit cards, the decedent told the receptionist that she did not have confirmation of her insurance and could not afford to pay for the session. According to defendant, the receptionist stated that the decedent nonetheless should wait to see the doctor because he needed to monitor her medication. The decedent allegedly refused to wait for defendant and informed the receptionist that she was doing fine with the medication and that she would make a new appointment in a couple of weeks when her insurance was in place. At some point thereafter, the decedent and defendant scheduled another appointment for February 4, 2000, approximately one month after her first visit. Tragically, however, the decedent committed suicide two days before the scheduled session.

Plaintiff filed an action against defendant for wrongful death and medical malpractice, alleging that defendant deviated from accepted standards of care "[i]n his evaluation, treatment and care of the decedent" and that his deviation was a proximate cause of the decedent's suicide. Plaintiff's expert, Dr. Steven S. Simring, opined that, even assuming defendant's version of the facts, defendant deviated from the appropriate standard of medical care in his treatment of the decedent and "essentially abandoned her." Specifically, the expert submitted that

[a]lthough Dr. Klebanov appropriately assessed the high risk of suicide, he did not take appropriate action to deal with that risk. His failure to do so was one major factor that led to Ms. Marshall's suicide. It is my opinion, to a reasonable degree of medical probability, that Dr. Klebanov's actions constitute a deviation from the proper standard of medical and psychiatric care, *because he abandoned this patient. He failed to provide her with adequate monitoring and treatment and failed to refer her elsewhere.*

[Emphasis added.]

After discovery was complete, defendant filed a motion for summary judgment, alleging that he was immune from liability under

*N.J.S.A.* 2A:62A–16, which sets forth a mental health practitioner's "duty to warn and protect" third parties or a patient from "a threat of imminent, serious physical violence."

The trial court granted defendant's motion for summary judgment and dismissed plaintiff's complaint. The court found that "the language in the statute is unambiguous" and that "*N.J.S.A.* 2A:62A–16a provides the defendant, Dr. Klebanov, here, with an immunity, so long as one of the two subsections of [b] are not applicable." The court then determined that the subsections do not apply because the decedent's family members "did not suspect that [her suicide] was imminent," and defendant "had not [physically] seen the patient since January 7th."

In a published opinion, the Appellate Division reversed, holding that "*N.J.S.A.* 2A:62A–16 does not bar plaintiff's negligence action." *Marshall, supra,* 378 *N.J.Super.* at 380, 875 *A.2d* 1035. The panel reasoned that

[t]he statute does not deal with all suicides or violent acts against another that may occur during a patient's psychiatric treatment. Unless the case involves a duty to warn and protect, the statute is not implicated. . . .

Under [*N.J.S.A.* 2A:62A–16], a mental health practitioner who incurs a duty to "warn and protect," because the threat of violence is imminent, can be liable for failing to discharge that duty in the manner specified. The practitioner who has not incurred a duty to "warn and protect" under the statute is not liable for failure to "warn and protect," but can be liable for other deviations from the accepted standard of care that are proximate causes of a patient's violent act or suicide. . . .

[Id. at 377, 875 *A.2d* 1035 (citations omitted).]

As a result, the court remanded the matter for a jury to determine whether, under the common law, defendant's conduct met the accepted standard of care and, if not, whether that deviation was the proximate cause of the decedent's suicide. *Id.* at 380, 875 *A.2d* 1035. The dissent argued that the language of the statute clearly and unambiguously applies to plaintiff's situation, thereby abrogating the common law and precluding liability. *Id.* at 381, 383, 875 *A.2d* 1035 (Fuentes, J., dissenting). This appeal is now before us as of right based on the dissent. *R.* 2:2–1(a)(2).

## II.

Defendant argues that the Appellate Division's decision is contrary to the plain language of *N.J.S.A.* 2A:62A–16. According to defendant, the statute shields a mental health practitioner from any civil liability when the underlying cause of action arises out of a patient's violent acts, unless the practitioner incurs a duty to warn and protect under subsection b of the statute. Defendant claims that no such duty arose in this matter because there is insufficient evidence in the record to conclude that the decedent's suicide was "imminent." Defendant also contends that the common-law standard of care applied by the Appellate Division is "inapplicable" to this matter because the Legislature's enactment of *N.J.S.A.* 2A:62A–16 abrogated that standard of care.

Plaintiff counters that the statute does not apply to the facts of this case. Plaintiff submits that defendant's interpretation effectively would eliminate any standard of care for mental health practitioners treating potentially suicidal patients—a result that the Legislature could not have intended. In plaintiff's view, had the Legislature intended to replace the common-law standard of care, it would have done so expressly. Plaintiff further asserts that, applying the common-law standard of care, there is ample evidence in the record to conclude that defendant committed malpractice by abandoning his patient and failing to provide her with appropriate treatment. Alternatively, plaintiff argues that even if the Court finds that *N.J.S.A.* 2A:62A–16 does apply to this matter, defendant is still liable because the decedent's suicide was "imminent," thereby triggering a duty on the part of defendant to warn and protect against her suicide.

## III.

Historically, under New Jersey's common law it is well settled that "[a] physician must act with that degree of care, knowledge, and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in the field." *Velazquez v. Portadin,* 163 *N.J.* 677, 686, 751 *A.*2d 102

(2000) (citing *Walck v. Johns–Manville Prods. Corp.*, 56 *N.J.* 533, 560, 267 *A.*2d 508 (1970)). That duty of care "encompasses, and is shaped by, the plaintiff-patient's medical condition," *Cowan v. Doering*, 111 *N.J.* 451, 461, 545 *A.*2d 159 (1988), and continues until such time as the physician-patient relationship is terminated, *Brandt v. Grubin*, 131 *N.J.Super.* 182, 193, 329 *A.*2d 82 (Law Div.1974). If a physician deviates from the applicable standard of care in the treatment of a patient and that deviation proximately causes harm to the patient, then the physician is liable for damages caused by his or her professional negligence. *See Verdicchio v. Ricca*, 179 *N.J.* 1, 23, 843 *A.*2d 1042 (2004).

For example, a dereliction of the professional duty of care may occur when a mental health practitioner abandons a patient by failing "to continue to provide service to the patient when it is still needed in a case for which the physician has assumed responsibility and from which he has not been *properly* relieved." *Clark v. Wichman*, 72 *N.J.Super.* 486, 492, 179 *A.*2d 38 (App.Div.1962) (emphasis in original) (citation omitted); *see also Brandt, supra*, 131 *N.J.Super.* at 193, 329 *A.*2d 82 ("[A]bandonment of a case by a physician without sufficient notice or adequate excuse is a dereliction of duty, and if injury results therefrom, the physician may be held liable in damages." (citation omitted)). Moreover, when there is a foreseeable risk that a patient's condition, as it is known to the practitioner, will lead the patient to injure him or herself, *Cowan, supra*, 111 *N.J.* at 462, 545 *A.*2d 159, a psychiatrist can be found to have breached his or her professional duty of care, if "in the application of accepted medical practice, [he or she] knew or should have known that [the patient] presented a risk of suicide requiring special precautions," *Fernandez v. Baruch*, 52 *N.J.* 127, 130, 244 *A.*2d 109 (1968).

In 1979, following the California Supreme Court's landmark ruling in *Tarasoff v. Regents of the University of California*, 17 *Cal.*3d 425, 131 *Cal.Rptr.* 14, 551 *P.*2d 334 (1976), the Law Division also imposed a duty on psychiatrists to warn potential victims of a

dangerous patient in *McIntosh v. Milano,* 168 *N.J.Super.* 466, 489, 403 *A.*2d 500 (Law Div.1979). The court required that

> *[a psychiatrist must] take whatever steps are reasonably necessary* to protect an intended or potential victim of his patient when he determines, or should determine, in the appropriate factual setting and in accordance with the standards of his profession established at trial, that the patient is or may present a probability of danger to that person.
>
> [*Ibid.* (emphasis added).]

Then, in 1991, the Legislature enacted *N.J.S.A.* 2A:62A–16, the statute at question in this appeal, which provides that

> [a]ny person who is licensed in the State of New Jersey to practice psychology, psychiatry, medicine, nursing, clinical social work or marriage counseling, whether or not compensation is received or expected, *is immune from any civil liability for a patient's violent act against another person or against himself unless the practitioner has incurred a duty to warn and protect the potential victim as set forth in subsection b. of this section and fails to discharge that duty as set forth in subsection c. of this section.*
>
> [*N.J.S.A.* 2A:62A–16a (emphasis added).]

Under subsection b, a mental health practitioner incurs a "duty to warn and protect" when:

> (1) The patient has communicated to that practitioner a threat of *imminent,* serious physical violence against a readily identifiable individual or against himself and the circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out the threat; or (2) The circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out an act of *imminent,* serious physical violence against a readily identifiable individual or against himself.
>
> [*N.J.S.A.* 2A:62A–16b (emphasis added).]

A practitioner can discharge that duty by arranging for the admission or involuntary commitment of the patient into a psychiatric hospital or appropriate care facility, *N.J.S.A.* 2A:62A–16c(1), (2); "[a]dvising a local law enforcement authority of the patient's threat and the identity of the intended victim," *N.J.S.A.* 2A:62A–16c(3); or warning the intended victim or the parent or guardian of the intended victim if the intended victim is a minor or if the patient is a minor and threatens to injure him or herself, *N.J.S.A.* 2A:62A–16c(4), (5). Finally, the statute provides that any practitioner who, in complying with subsection c, discloses confidential information learned from a patient during treatment "is immune

from civil liability in regard to that disclosure." *N.J.S.A.* 2A:62A–16d.

The Sponsor's Statement introducing the law explains that

[s]tate and federal courts are shaping remedies for victims of violent crimes which include a cause of action against licensed practitioners of psychology, medicine or marriage counseling for failing to warn of a patient's potentially violent behavior.

. . . .

*Under current law, the therapist's legal responsibility to warn of a patient's potential for violence is unclear.* At the same time, the therapist must attempt to maintain a therapeutic relationship with that patient. Thus, a therapist may be placed in the untenable position of being subject to liability under two competing theories: for failing to warn a potential victim of the patient's capability for violence, or, in the alternative (if the therapist has chosen to disclose the threat), for disclosing confidential communications between the therapist and the patient.

*This bill serves as a specific guideline for practitioners caught in this quandary and protects them from liability under appropriate circumstances.*

[*Sponsor's Statement to Senate Bill No. 3063,* at 2 (Nov. 19, 1990) (emphasis added).]

Citing *McIntosh,* the Senate Judiciary Committee Statement similarly notes that "[i]n recent years, there has been a growth in the number of civil actions in which victims of violent crimes have sued psychiatrists and therapists for failing to warn of a patient's potentially violent behavior." Senate Judiciary Committee, *Statement to Senate Bill No. 3063,* at 1 (Mar. 11, 1991).

IV.

A.

With that background as our guide, we turn to the issue in this appeal: whether the statutory immunity provisions of *N.J.S.A.* 2A:62A–16 immunize a mental health practitioner from potential liability when it is alleged that the practitioner abandoned a seriously depressed patient and failed to provide the patient with appropriate treatment. When interpreting a legislative enactment, "our overriding goal must be to determine the Legislature's intent." *Cornblatt, P.A. v. Barow,* 153 *N.J.* 218, 231, 708 *A.*2d 401 (1998) (internal quotation marks and citation omitted). Our starting point in that inquiry is the language of the

statute itself. *Velazquez v. Jiminez*, 172 *N.J.* 240, 256, 798 *A.*2d
51 (2002). If the language is clear, then " 'the sole function of the
courts is to enforce it according to its terms.' " *Hubbard ex rel.
Hubbard v. Reed*, 168 *N.J.* 387, 392, 774 *A.*2d 495 (2001) (quoting
*Sheeran v. Nationwide Mut. Ins. Co.*, 80 *N.J.* 548, 556, 404 *A.*2d
625 (1979) (citation omitted)). However, when "a literal applica-
tion of the language used would lead to results incompatible with
the legislative design," we are obligated "to give effect to the
obvious purpose of the Legislature." *New Capitol Bar & Grill
Corp. v. Div. of Employment Sec.*, 25 *N.J.* 155, 160, 135 *A.*2d 465
(1957). To that end, "words used may be expanded or limited
according to the manifest reason and obvious purpose of the law.
The spirit of the legislative direction prevails over the literal sense
of the terms." *Ibid.* (citations omitted).

　　　　　Moreover, a statute in derogation of the common law
should be strictly construed. *Velazquez, supra,* 172 *N.J.* at 257,
798 *A.*2d 51. Doubt about the meaning of such statutes should be
resolved in favor of

> the effect which makes the least rather than the most change in the common law.
> The rule has been declared by the United States Supreme Court, as follows: "No
> statute is to be construed as altering the common law, farther than its words
> import. It is not to be construed as making any innovation upon the common law
> which it does not fairly express."
>
> [*Oswin v. Shaw,* 129 *N.J.* 290, 310, 609 *A.*2d 415 (1992) (quoting 3 Norman J.
> Singer, *Sutherland Statutory Construction* § 61.01, at 77 (4th ed. 1986) (footnote
> omitted) (quoting *Shaw v. R.R. Co.,* 101 U.S. 557, 565, 25 *L.Ed.* 892, 894 (1880))).]

That interpretive canon works in conjunction with the principle
that statutes granting immunity from tort liability "should be
given narrow range" because they leave "unredressed injury and
loss resulting from wrongful conduct." *Harrison v. Middlesex
Water Co.,* 80 *N.J.* 391, 401, 403 *A.*2d 910 (1979); *see also Potter v.
Charles V. Finch & Sons,* 76 *N.J.* 499, 502, 388 *A.*2d 614 (1978)
("[I]mmunity from tort liability is not favored in the law since it
bars the injured person from the recovery of compensatory dam-
ages against the party who is otherwise responsible for the
injury.").

## B.

■ We hold that the statutory immunity provisions of *N.J.S.A.* 2A:62A–16 do not immunize a mental health practitioner from potential liability if the practitioner abandons a seriously depressed patient and fails to treat the patient in accordance with accepted standards of care in the field. The statute's legislative history makes clear that the act was intended only to codify *McIntosh* and to clarify the ways in which a mental health practitioner can discharge the duty to warn and protect potential victims of violence without incurring liability for disclosure of confidential information. *See* Senate Judiciary Committee, *Statement to Senate Bill No. 3063, supra,* at 1 (citing *McIntosh, supra,* 168 *N.J.Super.* 466, 403 A.2d 500); *Sponsor's Statement to Senate Bill No. 3063, supra,* at 2 ("Under current law, the therapist's legal responsibility to warn of a patient's potential for violence is unclear. . . . This bill serves as a specific guideline for practitioners caught in [a] quandary [between a duty to warn and the duty of confidentiality] and protects them from liability under appropriate circumstances."). Notably absent from the text of the statute or its history is any mention of a legislative intent to immunize mental health practitioners from liability for deviations from accepted standards of care in the treatment of such patients. In that respect, we agree with the Appellate Division that "[h]ad the Legislature intended to sweep as broadly as defendant argues and eliminate all liability for suicide for any reason when the threat of suicide was not imminent, . . . it would have signaled its intentions with greater clarity." *Marshall, supra,* 378 *N.J.Super.* at 378, 875 A.2d 1035.

A practitioner's common-law duty to exercise that degree of care, knowledge, and skill for his or her patient that would be followed by any reasonable member of the profession under like circumstances exists separate and apart from any duty to warn and protect pursuant to *N.J.S.A.* 2A:62A–16. In this case, the separate duty of care would involve the putative abandonment of a patient by failing to provide the patient with adequate monitoring or treatment. In another case, a breach of the duty of care may

involve prescribing the wrong medication to a patient that causes the patient to commit suicide. Thus, even if a practitioner does not incur a duty to warn and protect under the statute, he or she may still be liable for a breach of his or her duty to treat a patient in accordance with applicable professional standards. Indeed, it would seem axiomatic that practitioners be required to exercise reasonable care in the treatment of all patients, including those with suicidal tendencies.

Moreover, defendant's interpretation of the statute would permit a practitioner to put him or herself in a position, through abandonment, so that he or she is unable to determine whether an imminent threat of serious, physical violence exists—thereby never incurring a duty to warn and protect under the statute and avoiding any liability to the patient regardless of the circumstances. Furthermore, by providing practitioners who treat potentially suicidal patients with little incentive to abide by professional standards of care, defendant's reading of the statute could have the effect of allowing a patient's suicidal impulses to go undetected as a result of inadequate or inconsistent examination and treatment. Because of the fact that "disruption of a practitioner's therapeutic relationship with a severely upset patient may also serve to increase the possibility of the patient's violent acts," *Sponsor's Statement to Senate Bill No. 3063, supra,* at 2, such negligence could have disastrous consequences. We doubt that the Legislature intended such results. Thus, we conclude that *N.J.S.A.* 2A:62A–16 does not bar plaintiff's claims against defendant under the common law for abandoning the decedent and failing to treat her in accordance with the applicable standard of care. Because the trial court never ruled on whether plaintiff alleged sufficient evidence under the common law to establish such claims, we remand this matter to the trial court for further proceedings.

## V.

In light of our holding, we must address one final issue: whether, separate and apart from any duty under the common

law, partial summary judgment in favor of defendant is appropriate concerning whether defendant incurred a duty to warn and protect under *N.J.S.A.* 2A:62A–16. As noted, the trial court found that defendant did not incur such a duty because the decedent's suicide was not "imminent" under *N.J.S.A.* 2A:62A–16b. In reaching that conclusion, the court reasoned both that the decedent's close family members had not suspected that her suicide was imminent and that defendant had not treated the decedent recently enough to make such a determination.

▮ Viewing the facts in the light most favorable to plaintiff, we agree with the trial court's findings on imminency. The decedent's husband testified that, in the two weeks preceding his wife's suicide, he did not perceive an imminent threat of her taking her life. The decedent's mother similarly stated that when she spoke with her daughter over the phone on the morning of her suicide, she did not do or say anything that seemed alarming and that "[s]he sounded pretty good." Moreover, although plaintiff's expert, Dr. Simring, found that defendant assessed a "high risk of suicide" when he examined the decedent on January 7, 2000, Dr. Simring's report does not assert that defendant should have recognized the decedent as an imminent threat to herself. Finally, it is the alleged abandonment by defendant of the decedent that prevented defendant from determining whether an imminent threat of suicide existed. For those reasons, we affirm the trial court's grant of summary judgment regarding whether defendant incurred a duty to warn and protect under *N.J.S.A.* 2A:62A–16.

## VI.

The judgment of the Appellate Division is affirmed as modified, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, dissenting.

*N.J.S.A.* 2A:62A–16a specifically provides that "[a]ny person who is licensed ... to practice ... psychiatry ... is immune from

any civil liability for a patient's violent act against ... himself unless the practitioner has incurred a duty to warn and protect...." *N.J.S.A.* 2A:62A–16b makes clear that a mental health practitioner incurs a duty to warn and protect only when there is a threat actually communicated by the patient or the reasonable professional belief by the practitioner of "imminent, serious physical violence...." Read together, as they must, these provisions make clear that, unless there is a threat actually communicated by the patient or the reasonable professional belief by the mental health practitioner of "imminent, serious physical violence[,]" a licensed psychiatrist is "immune from any civil liability for a patient's violent act against [himself.]"

Although the majority agrees with the trial court's conclusion that the defendant psychiatrist did not incur a duty to warn and protect, *ante*, 188 *N.J.* at 40, 902 *A.*2d at 883 (2006), the majority nonetheless concludes that "the statutory immunity provisions of *N.J.S.A.* 2A:62A–16 do not immunize a mental health practitioner from potential liability if the practitioner abandons a seriously depressed patient and fails to treat the patient in accordance with accepted standards of care in the field." *Ante,* 188 *N.J.* at 38, 902 *A.*2d at 881–82 (2006). According to the majority, that conclusion is compelled because "[a mental health] practitioner's common-law duty to exercise that degree of care, knowledge, and skill for his or her patient that would be followed by any reasonable member of the profession under like circumstances exists separate and apart from any duty to warn and protect pursuant to *N.J.S.A.* 2A:62A–16." *Ante,* 188 *N.J.* at 38, 902 *A.*2d at 882 (2006). The majority, therefore, reasons that, "even if a practitioner does not incur a duty to warn and protect under the statute, he or she may still be liable for a breach of his or her duty to treat a patient in accordance with applicable professional standards." *Ante,* 188 *N.J.* at 39, 902 *A.*2d at 882 (2006).

For the reasons so ably expressed by Judge Fuentes in his dissent in the Appellate Division, *Marshall v. Klebanov,* 378 *N.J.Super.* 371, 381, 875 *A.*2d 1035 (App.Div.2005) (Fuentes, J.,

dissenting), I cannot agree with the majority's interpretation of this statute. As rightly noted by Judge Fuentes, "the statute immunizes a mental healthcare practitioner from 'any civil liability' for a patient's self-injurious acts, unless he or she has incurred a 'duty to warn and protect[.]' " *Ibid.* Analytically, the statute is quite clear. The basic statutory standard is that a mental health practitioner is immune from *any* civil liability from a patient's self-inflicted acts. *N.J.S.A.* 2A:62A–16a. An exception to that immunity arises if and only if the practitioner has incurred a new, statutorily-created duty to warn and protect. *Ibid.* The duty to warn and protect arises only in the context of communicated or perceived "imminent, serious physical violence" against the patient himself or against another. *N.J.S.A.* 2A:62A–16b. Once that duty arises, however, the mental health practitioner can discharge the duty by (1) voluntarily admitting the patient, (2) involuntarily committing the patient, (3) advising local law enforcement of the threat of harm and the intended victim, (4) warning the intended victim of the threat, or (5) warning the parents of a minor patient of the threat. *N.J.S.A.* 2A:62A–16c.

The application of the legislative construct to this case is simple and direct. Because the majority agrees that defendant did not incur a duty to "warn and protect," the mandated conclusion is self-evident from the plain language of the statute: the mental health practitioner "is immune from any civil liability for a patient's violent act against ... himself...." Any different construction of this statute renders meaningless an otherwise lawful act of the Legislature.

The Legislature made the equation clear: no duty to warn and protect equals immunity from *any* civil liability. Insofar as the majority agrees that defendant was under no duty to warn and protect plaintiff's decedent, the majority similarly should honor the Legislature's clearly stated view that the inquiry is at an end and no liability can be imposed on defendant. Because I cannot ignore the Legislature's clearly expressed will, I respectfully dissent.

*For affirmance as modified/remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, and WALLACE—5.

*For reversal*—Justices RIVERA–SOTO—1.